Elaine MARTIN, Plaintiff,

v.

THE KROGER CO. and Charles
Hembree, Defendants.

No. Civ.A. H–98–2120.

United States District Court,
S.D. Texas.

Sept. 15, 1999.

Eddie M. Krenek, Katy, TX, Althea Michele Bailey, Law Office of Eddie M. Krenek, Katy, TX, for plaintiff.

A. Martin Wickliff, Jr., Wickliff and Hall, Houston, .TX, Susanne L. Tetzlaff, Wickliff and Hall, Houston, TX, for defendants.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendants The Kroger Co. ("Kroger") and Charles Hembree's ("Hembree") Motion for Summary Judgment (# 18). Kroger and Hembree seek summary judgment on Plaintiff Elaine Martin's ("Martin") claims of racial and sexual discrimination and retaliation under the Texas Commission on Human Rights Act ("TCHRA") as well as tortious interference with existing and prospective business relations. Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that summary judgment should be granted.

I. *Background*

Kroger is a retail grocery chain with a number of stores in the Houston, Texas, area. Martin, an African–American female, began her employment with Kroger in August 1992 in the company's management training program after answering an advertisement for an engineering position. Martin graduated from Prairie View A & M University in 1986 with an electrical engineering degree. In March 1993, Hembree, the manager of the Facility Engineering Department, offered her a position as a facility engineer.

Kroger's Engineering Department is responsible for the construction and remodeling of· Kroger grocery stores, with facility engineers serving as the project managers on the various construction and remodeling projects. In this capacity, facility engineers are responsible for planning, organizing, and estimating costs of

the project; interpreting specifications; soliciting bids from subcontractors; ordering equipment and scheduling its placement; acting as a liaison between Kroger and city officials; ensuring that all governmental codes and requirements are met in a timely fashion; and communicating regularly with the project team, including scheduling and presiding over weekly construction meetings. The project manager bears the responsibility for the organization, oversight, and management of all aspects of the construction project, without regard to whether a general contractor is also used.

In her affidavit, Martin describes how Hembree assisted her in securing a position in Kroger's Engineering Department:

I ... answered Kroger's classified ad for a Facility Engineer. I spoke with Charles Hembree several times about the job, and interviewed with a number of Kroger employees. Hembree informed me that I had not been selected to fill the vacancy, and that a person with better qualifications than me had been hired.

However, Hembree asked if I would be interested in training to become a store co-manager, which had no relation to the engineering department.... I needed work, in any capacity, and agreed to enter Kroger's store management training program in 1992, even though it was outside of my field and I had had no prior training, background or experience in such a position.

While I was in Kroger's store management training program, Hembree contacted me and asked if I was interested in transferring to Facility Engineering. The vacancy that Hembree contacted me about was the same job that I had applied for and had been rejected previously. T. Stevens Brown, the person that Hembree had described to me as 'better qualified,' was removed from that position because he did not have an engineering degree. (T. Stevens Brown, and I went to the same college, and I know that he did not complete his degree program.)

Martin began working as a facility engineer on March 21, 1993. In his affidavit, Hembree explains his basis for offering her the position: "I was aware that [Martin] did not have much experience in project management or the retail industry; however, I felt Ms. Martin was capable of gaining the knowledge necessary to become an effective manager and engineer."

Throughout her employment with Kroger, Martin's performance as a facility engineer was problematic. Her first employee performance appraisal, dated June 10, 1994, reflects below-average ratings in several categories. One such category is "Leadership," which addresses how the employee leads "individuals or groups to accomplish a task or accept an idea; ability to help a group or an individual arrive at a solution or goal." Martin's below-average rating of "Developmental" is followed by comments stating, "Elaine has a rather forceful, directive style. This has served her effectively without causing hostility in most cases. There is room in her leadership style to develop a more participative [sic] approach. She should understand the tasks of subordinates more thoroughly." The "Personal Impact" category assesses the employee's "[a]bility to create a good impression on others by commanding attention, respect, and showing confidence." The comments following Martin's "Developmental" rating read, "Elaine is able to gain impact but usually has to do it through force of will. She must gain the reputation of knowing what to do, how to do it, and when. By being knowledgeable in these areas, the respect will follow." Finally, the "Problem Analysis" category measures the employee's "[a]bility to identify, evaluate, and assimilate factors essential to analyzing a problem for a solution." Martin's "Developmental" rating is followed by comments stating, "Elaine often fails to properly analyze a problem because she does not link all sources of information together. She should ask more questions such as 'who, what, when, where, and how.' By listening to these answers, then assimilate the data to see if it makes

sense." Hembree's affidavit offers additional insight into his June 1994 assessment of her performance:

> At that time, I considered Ms. Martin to be still relatively new to the department and to have issues which were developmental in nature. In other words, I felt that Ms. Martin's lack of knowledge and experience in the retail construction field hindered her from performing at a higher level. I apprised Ms. Martin of certain deficiencies and the need for education in business administration and construction technology. I suggested Ms. Martin enroll in a seminar on interpreting blueprints which she took in July 1994.

Hembree contends that he "remained optimistic that [Martin] could overcome the knowledge deficit she had."

When Martin was evaluated one year later, on June 13, 1995, she received more "Developmental" ratings, including below-average ratings in "Leadership," "Personal Impact," and "Problem Analysis." The comments following the "Leadership" category state, "Elaine has improved in this area. Her style is still rather forceful and direct. She recently completed 'Models for Management' seminar. This should help her in the future to develop a more participative [sic] style." Under the "Personal Impact" category, the comments read, "Elaine displays a limited effect on the direction or the decision making of others. She is not sought after for input other than as needed to accomplish [the] task at hand. She does have some impact because of a dominant type behavior but does not command attention through confidence." Finally, the comments following the "Problem Analysis" category state, "Elaine sometimes fails to see the relevance of different factors in properly analyzing a situation. She must continue to probe more deeply when developing a plan. Ask more open ended questions. Discuss solutions to verify understanding."

A typed statement prepared by Hembree, signed by both Hembree and Martin, is attached to the evaluation, stating:

> During Elaine's early development in this department, her knowledge of supermarketing, and construction was very limited. These issues were discussed during the last performance evaluation. She has worked hard to try to learn these details and has made some progress. Elaine must continue to develop these skills.

> I believe that Elaine can become an effective manager in this department; however, she has developed an impression in many managers that she lacks the knowledge and skills necessary to adequately manage a substantial remodel project. Although her project results are of good quality, she does not get the credit that she perhaps is due. Store managers felt that they had to do more project administration than necessary in order to complete their projects. Phone calls, equipment follow-ups, scheduling of merchandisers and other communication issues are mentioned as hindrances to effective job performance. There is some concern that Elaine does not place enough priority on the importance of being available or of maintaining contact with each project. Unfortunately, these impressions precede her into her next project assignment and as a result store management may look for faults that might be overlooked in someone without this reputation.

> \* \* \* \* \* \*

> I continue to enjoy working with Elaine. I am somewhat disappointed that even though there have been improvements in several areas, I continue to receive comments about her communications, her responsiveness to stores, and her ability to control a project. Last year, many of these comments could have been overlooked due to the fact that Elaine was new to Kroger and as yet had not fully learned all the facets of her job. However, Elaine has spent six months in the co-manager training program and then another two years in Facility Engineering. These comments should be disap-

pearing by now. The fact that they have persisted will make the demands of Elaine's job even tougher than before.

The statement also refers to two seminars that Kroger arranged for Martin to attend to further her education. These conferences provided training to Martin in engineering and construction of retail stores and supermarkets. By letter dated October 31, 1995, Hembree recommended that Martin receive 250 stock options because her performance had significantly improved.

Due to an extended leave of absence in 1995, Martin did not receive a performance evaluation in 1996. Hembree, however, describes Martin's performance during this time period in his affidavit:

> I found that she continued to display a limited knowledge of supermarketing and construction with no sign of improvement.... I was aware of several instances in which she failed to order the correct equipment for a project; she ordered duplicate equipment; she ordered unnecessary equipment which had to be returned; and, she failed to order the appropriate sizes and types of equipment, which resulted in delays.

Hembree also states that, despite her tenure, Martin continued to perform at a level below that of the other engineers in the department.

Martin's evaluation dated May 30, 1997, again reflected "Developmental" ratings, including below-average ratings in "Leadership," "Personal Impact," and "Problem Analysis." Hembree's typed statement attached to the evaluation elaborates on her performance:

> Elaine will soon complete her fifth year in the Facility Engineering department. She continues to be assigned within the walls remodels and new store projects. Her projects are usually on schedule and within budget.
>
> * * * * * *
>
> [The] ability to be friendly and likable is a positive attribute; however, when combined with her limited knowledge of supermarketing and construction may

actually contribute to her lack of growth in these areas. Elaine has had supporters—both within Kroger and among our vendors—that have wanted her to succeed. Believing that Elaine might not know how her work affects the store's operation, or that she might not know the technical aspects of construction, these supporters have done what needed to be done on her behalf to complete a project.... As a result of this other departmental involvement, her projects have succeeded. If Elaine were placed into a situation where she did not have participants that were knowledgeable and supportive, her current level of knowledge would prevent her from delivering a successful project. Her current projects could show substantial improvement in both timing and costs if Elaine were more knowledgeable about the items just discussed. Elaine must spend a portion of each week learning the technical aspects of her job if she is to make continued progress.

> Elaine must also continue to develop her skills of Planning and Organizing. When presented with a well developed plan, she does a good job of execution. When left to her own devices; however, Elaine's projects seem to be helter-skelter. Job schedules are prepared as equipment becomes available and not in a logical, convenient order. Forward thinking about the upcoming tasks and knowledge of their intricacies must be present in order to develop a smoothly flowing schedule that completes itself in a manner most satisfying to everyone involved. The ordering of refrigerated equipment seems to be one example of the deficiencies in this skill. Equipment is sometimes ordered before the fixture plan or the schedule is finalized. There have been instances where equipment arrived that was not needed and had to be returned, equipment that was ordered incorrectly, and shortages of equipment that caused delays in completion of project elements. One would expect this sort of performance from

someone who is inexperienced in remodels, but after as many years as Elaine has been in this job, these elemental processes should be better. Elaine must improve in her ability to organize and coordinate those particulars that impact her projects and to evolve a plan for successful completion.

\* \* \* \* \* \*

The support that Elaine has enjoyed over her career has begun to diminish and will continue to dwindle if her skills of Planning and Organizing as well as her knowledge of the business do not improve significantly in the current year. Her continued support within the organization has come from the recognition that Elaine is making any and all efforts toward doing a 'first class' job; however, there is sufficient indication that others are becoming weary of bolstering Elaine on a continuing basis. This places her in a very precarious position that must be secured by immediate improvements in these skills in order to be assured of a future with this organization in the following year.

\* \* \* \* \* \*

I continue to enjoy working with Elaine. It is still disappointing that these realities and perceptions remain after almost five years. Elaine must continue to bring forth the efforts and improvements that are required of her.

Martin and Hembree both signed this statement.

To improve quality and reduce expenses, Kroger began remodeling its stores with the use of primarily in-house crews in 1997. The Kroger store located on Montrose Street in Houston, Texas, was the first in-house project. Randy Kottlowski ("Kottlowski"), a white male facility engineer, managed the Montrose remodeling project. Kottlowski, formerly the assistant manager of the department, was given this opportunity after he was demoted to the position of facility engineer and placed on probation on February 5, 1997, due to perceived performance problems. Upon completion of the Montrose project, Kro-

ger estimated that it had saved approximately $100,000 through the use of an in-house crew.

In September 1997, the Kroger store in Seabrook, Texas, was identified as the next in-house remodeling project. Hembree assigned this project to Martin. In the capacity of project engineer, she was responsible for preparing a cost estimate and hiring subcontractors for the plumbing, electrical, floor tile, carpet, and painting. In addition, she was responsible for obtaining all the necessary city permits and complying with the applicable building codes. Martin was also required to review the architect's plans and familiarize herself with the specifications for the project. Hembree assigned Terry Hildebrandt ("Hildebrandt"), Kroger's lead carpenter, as the superintendent of the Seabrook project. As superintendent, Hildebrandt was responsible for overseeing the daily construction and managing the various craft crews. He had successfully served as the superintendent of the Montrose project. As the project engineer, Martin was Hildebrandt's superior.

The Seabrook project was scheduled to begin on September 15, 1997. The commencement of the project was delayed, however, when Martin failed to obtain the necessary building permit in advance of the planned start date. Unlike the Montrose project, the record reflects that the Seabrook project was fraught with problems. Ida Spearman ("Spearman"), the Seabrook store manager, describes some of these difficulties in her affidavit:

> During the course of the project, I experienced great difficulty in contacting and communicating with Ms. Martin. She often did not return my telephone calls, pages or emails or was untimely in doing so. Although Ms. Martin was very nice and likeable, she appeared to lack organization and management of the project. She seemed to have no control over the construction meetings or the subcontractors and crew. The plans which we were given by Ms. Martin were not ac-

curate for the project which interfered with the work of the store merchandisers and other crews. I felt she had poorly coordinated the project. On several occasions I discussed my concerns regarding Ms. Martin's handling of the project with Charles Hembree.

Several times the wrong equipment or surplus equipment showed up at the store. My understanding was that Ms. Martin was responsible for ordering the equipment. For instance, two sets of Huggieland play equipment were ordered and delivered to the store. Ms. Martin said she would take care of the problem, however she never did. Additionally, Ms. Martin ordered the wrong kind of bascarts for the store despite my providing her with information for the proper carts. I had to send the carts back. Ms. Martin was supposed to contact the bank which had an ATM machine in our store in order to arrange for the machine to be picked up. I was forced to handle this task as well.

I had numerous problems with Anthony Gaston, the flooring subcontractor hired by Ms. Martin. Mr. Gaston failed to show up when promised, would not complete the work he started and would leave supplies in the public areas of the store. For instance, Mr. Gaston and his workers were supposed to lay new carpet in the store's offices on December 31, 1997. My employees and I moved the furniture after Mr. Gaston and his crew failed to show up. When Mr. Gaston promised the crew would do the work on January 1, [1998], we again moved the furniture in preparation. Mr. Gaston called at 7:00 p.m. that evening to say that he could not locate his carpet people. The work was finally completed on January 3, [1998]. I regularly advised Ms. Martin of his poor workmanship, but to no avail. I also advised Charlie Hembree of the poor management and oversight by Elaine Martin of this part of the remodel.

By October 1997, news of Martin's problems at Seabrook reached Dave Burkart ("Burkart"), Vice President of Operations at Kroger. Around October 17, 1997, Burkart met with George Anderson ("Anderson"), Kroger's Manager of Human Resources, to discuss the deficiencies in Martin's performance. In his affidavit, Anderson recalls the meeting:

> Dave Burkart ... came to see me about the Seabrook project. He indicated that the quality of Ms. Martin's involvement in the project was less than desirable and that store management had complained. I sent an email to Charles Hembree regarding my visit from Mr. Burkart.

On November 25, 1997, Hembree and Anderson met with Martin and presented her with a supplemental performance evaluation. In the typed evaluation, Hembree outlines some of the problems associated with the Seabrook project:

> On May 30, 1997, Elaine's performance for 1996 was presented and discussed with her. This performance review noted skill deficiencies in several areas that were to show immediate improvement if Elaine were to be assured of a future with this organization. Since that time, Elaine has been assigned several projects in which to demonstrate adequate abilities of organizing and coordinating. Of her current projects, the within-the-walls remodel of [Seabrook] illustrates most clearly Elaine's lack of development in the elemental processes necessary for the successful completion of a construction project.
>
> \* \* \* \* \* \*
>
> Elaine's handling of this project continues to demonstrate the deficiencies that have been discussed on many past projects. Others both within the Kroger organization and among those outside express the same observations. The support that Elaine has enjoyed in the past appears to have been totally withdrawn based on these last few incidents.
>
> Elaine's performance is currently unsatisfactory and cannot continue. Although this is very disappointing, there remains

no other choice but to place Elaine on probation for the next ninety days. At the conclusion of this period, Elaine's performance will once again be reviewed. Failure to perform at a satisfactory level will result in immediate termination of employment.

Martin was not receptive to Hembree's comments and refused to sign the supplemental evaluation. Anderson describes the meeting with Hembree and Martin in his affidavit:

Ms. Martin became extremely upset and angry during the meeting and refused to sign the Supplemental Performance Evaluation. She indicated that she did not intend to change her performance and that Kroger would just have to fire her at the end of the probation period. She then made reference to having been referred to by a racial epithet, and she also made a comment about "Terry and his racist ass." However, when we questioned her about who had allegedly made racial slurs, Ms. Martin absolutely refused to provide any more information. She made a statement to the effect that it would "all come out in court." She then left the office. Prior to that time, I had not been notified by Ms. Martin or anyone else that any Kroger employees or subcontractors had made racially derogatory comments. Furthermore, Ms. Martin never complained of sex or gender-based discrimination in that or any other meeting.

On January 26, 1998, Martin was ill and did not report to work. The following day, she was involved in an automobile accident. On February 6, 1998, Martin provided a medical release which indicated that she would not be returning to work until February 20, 1998. Maria Gutierrez–Webber ("Gutierrez"), a Kroger Human Resources assistant, wrote to Martin on March 6, 1998, explaining:

According to our records, you have been off from work on an expired leave of absence since March 2, 1998.

Company policy concerning leave of absences is as follows:

"All leaves of absence for longer than 14 consecutive days, except military leaves in accordance with federal laws, must be requested in writing and approval or denial by management communicated to the employee in writing."

*Company policy concerning extensions for leaves for illness, injury, or pregnancy, must be requested in writing with a supporting medical statement from the attending physician prior to each expiration date to the approved leave.*

It is necessary for you to complete the enclosed leave of absence form and attach a statement from your **attending physician,** indicating all of the following:

1. Date of disability (in conjunction with approved leave that began 08/01/97)

2. Date of initial treatment

3. Reason for disability (nature of illness)

4. Anticipated return to work date.

**Please be advised that is [sic] this requested information is not received in *Human Resources within seven (7) days* from receipt of this letter that you are subject to termination for failure to return from a leave of absence....**

On March 26, 1998, Gutierrez sent another letter to Martin, stating:

I received the documents you supplied in support of extending your leave of absence. These documents do not include a date for your release to return to work, as required by the company's leave of absence procedures. Failure to do so, within 72 hours from receipt of the letter will result in termination for failure to return from a leave of absence.

The record does not disclose whether Martin ever responded to this letter.

■ Although Martin asserts in her affidavit that she worked sporadically after

her automobile accident, this assertion conflicts with her deposition testimony:

> Q: ... Ms. Martin, we were talking about how long [you] were out after your car accident before your doctors released you to return to work. Isn't it correct that you didn't return to work at Kroger after you had the car accident?
>
> A: Right.

The Fifth Circuit has consistently held that "[i]t is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir.1996); *see Crowe v. Henry*, 115 F.3d 294, 298 n. 4 (5th Cir.1997). Therefore, to the extent that Martin's affidavit is inconsistent with her deposition testimony, the court cannot consider it. Hembree, Brett Smollen ("Smollen"), a facility engineer who was later promoted to assistant manager, and Anderson confirm that Martin did not return to work until April 28, 1998. In any event, Martin's employment with Kroger was terminated when she reported to work that day.

Martin filed a charge of employment discrimination with the Texas Commission on Human Rights ("TCHR") and the Equal Employment Opportunity Commission ("EEOC") on December 9, 1997, asserting claims of race and sex discrimination as well as retaliation under the TCHRA. She amended her charge on February 5, 1998, to expand on her retaliation claim. At her request, Martin received a right-to-sue notice on March 20, 1998, and instituted this action in state court on May 14, 1998. Kroger removed the case to federal court on July 6, 1998, based on diversity of citizenship. In her original petition, Martin sought recovery for race and gender discrimination and retaliation in violation of the TCHRA and also asserted claims alleging negligent retention, wage and hour violations, tortious interference with existing and prospective business relations, and intentional inflic-

tion of emotional distress. On July 22, 1999, after Kroger filed its motion for summary judgment, Martin dismissed her claims for negligent retention, wage and hour violations, and intentional infliction of emotional distress. Thus, Martin currently seeks to recover for race and gender discrimination and retaliation under the TCHRA as well as for tortious interference with existing and prospective business relations.

## II. *Analysis*

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The parties seeking summary judgment bear the initial burden of informing the court of the basis for their motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Colson v. Grohman*, 174 F.3d 498, 506 (5th Cir.1999); *Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 321 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n*, 123 F.3d 321, 324 (5th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998). The moving parties, however, need not negate the elements of the nonmovant's case. *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir.1996) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

Once a proper motion has been made, the nonmoving party may not rest upon

mere allegations or denials in the pleadings, but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *See Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Colson,* 174 F.3d at 506; *Marshall,* 134 F.3d at 321–22; *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075. All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.,* 98 F.3d 179, 181 (5th Cir.1996) (citing *Lindsey v. Prive Corp.,* 987 F.2d 324, 327 n. 14 (5th Cir.1993)); *see Colson,* 174 F.3d at 506; *Marshall,* 134 F.3d at 321; *Messer v. Meno,* 130 F.3d 130, 134 (5th Cir.1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 794, 142 L.Ed.2d 657 (1999); *Hart v. O'Brien,* 127 F.3d 424, 435 (5th Cir.1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999); *Songbyrd, Inc. v. Bearsville Records, Inc.,* 104 F.3d 773, 776 (5th Cir.1997). " 'The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.' " *Reves v. Ernst & Young,* 507 U.S. 170, 190 n. 3, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (quoting *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505); *Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990); *see Marshall,* 134 F.3d at 321. Nonetheless, " 'only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party.' " *Eastman Kodak Co. v. Image Tech. Servs.,* 504 U.S. 451, 469 n. 14, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (emphasis in original). "If the [nonmoving party's] theory is . . . senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Id.* at 468–69, 112 S.Ct. 2072.

The nonmovant's burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or "only a scintilla of evidence." *Little,* 37 F.3d at 1075; *see Hart,* 127 F.3d at 435; *Wallace,* 80 F.3d at 1047; *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)); *State Farm Life Ins. Co. v. Gutterman,* 896 F.2d 116, 118 (5th Cir. 1990) (citing *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *See Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548; *Wenner,* 123 F.3d at 324. "In such a situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

## B. Claims Brought Under The TCHRA

Martin asserts race and gender discrimination claims under the TCHRA against Kroger and Hembree. The TCHRA provides:

An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:

(1) fails or refuses to hire an individual, discharges an individual, or discriminates against an individual in connection with compensation or the terms, conditions, or privileges of employment; or

(2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely

affect in any other manner the status of an employee.

Tex.Lab.Code Ann. § 21.051. "The legislature drafted the TCHRA to 'correlat[e] state law with federal law in the area of discrimination in employment.'" *Gold v. Exxon Corp.*, 960 S.W.2d 378, 380 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (quoting *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 485 (Tex.1991)); *accord NME Hosp., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex.1999); *see Thompson v. City of Arlington*, 838 F.Supp. 1137, 1153 (N.D.Tex.1993); *Elstner v. Southwestern Bell Tel. Co.*, 659 F.Supp. 1328, 1345 (S.D.Tex.1987), *aff'd*, 863 F.2d 881 (5th Cir.1988). The statute specifically states that one of its purposes is to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments (42 U.S.C. Section 2000e *et seq.*)." Tex.Lab.Code Ann. § 21.001; *see NME Hosp., Inc.*, 994 S.W.2d at 144; *Caballero v. Central Power & Light Co.*, 858 S.W.2d 359, 361 (Tex. 1993); *Schroeder*, 813 S.W.2d at 485; *Passons v. University of Tex. at Austin*, 969 S.W.2d 560, 563 n. 4 (Tex.App.—Austin 1998, no pet.); *Gold*, 960 S.W.2d at 380.

■ In keeping with the expressed legislative intent, the TCHRA is interpreted in a manner consistent with federal laws prohibiting employment discrimination. *See Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 492 (Tex.1996); *see also Elstner*, 659 F.Supp. at 1345. "In analyzing Plaintiff's claims under the Texas Commission on Human Rights Act, the court utilize[s] the same analysis as provided by the ADEA and Title VII." *Deaver v. Texas Commerce Bank*, 886 F.Supp. 578, 585 (E.D.Tex.1995), *aff'd*, 79 F.3d 1143 (5th Cir.1996) (citing *Farrington v. Sysco Food Servs., Inc.*, 865 S.W.2d 247, 251 (Tex. App.—Houston [1st Dist.] 1993, writ denied)); *see Gifford v. Lone Star Steel Co.*, 2 F.Supp.2d 909, 911 (E.D.Tex.1997); *Caballero*, 858 S.W.2d at 361. Indeed, the Texas Supreme Court has observed that, as Texas courts have had little opportunity to interpret the TCHRA, it is appropriate to seek guidance from cases interpreting Title VII. *See Specialty Retailers, Inc.*, 933 S.W.2d at 492; *Speer v. Presbyterian Children's Home & Serv. Agency*, 847 S.W.2d 227, 232 (Tex.1993). Therefore, the analysis of Martin's claims under the TCHRA is identical to that applied to similar claims brought under Title VII. *See Colbert v. Georgia–Pacific Corp.*, 995 F.Supp. 697, 700 (N.D.Tex.1998). "Because the TCHRA is the state counterpart to Title VII, the same standards apply." *Allison v. City of Fort Worth*, 60 F.Supp.2d 589, 593 (N.D.Tex.1999) (citing *Farrington*, 865 S.W.2d at 251; *Schroeder*, 813 S.W.2d at 485).

### 1. *Statute of Limitations*

■ The TCHRA establishes a comprehensive administrative review system for obtaining relief from unlawful employment practices. *See Schroeder*, 813 S.W.2d at 485; *Eckerdt v. Frostex Foods, Inc.*, 802 S.W.2d 70,.71 (Tex.App.—Austin 1990, no writ). Before suing for redress, an employee must exhaust the administrative remedies available under the Act. *See Caballero*, 858 S.W.2d at 360; *Schroeder*, 813 S.W.2d at 486. A person claiming to be aggrieved by an unlawful employment practice must file a complaint with the TCHR within 180 days of the alleged discriminatory act. *See* Tex.Lab.Code Ann. § 21.202(a) ("A complaint under this subchapter must be filed not later than the 180th day after the date the alleged unlawful employment practice occurred"); *Specialty Retailers, Inc.*, 933 S.W.2d at 492; *Schroeder*, 813 S.W.2d at 486; *Wal–Mart Stores, Inc. v. Davis*, 979 S.W.2d 30, 41 (Tex.App.—Austin 1998, no pet.); *O'Bryant v. City of Midland*, 949 S.W.2d 406, 417 (Tex.App.—Austin 1997, pet. granted); *Vincent v. West Tex. State Univ.*, 895 S.W.2d 469, 473 (Tex.App.—Amarillo 1995, no writ); *Eckerdt*, 802 S.W.2d at 71. These requirements ensure that "the Commission [has an] opportunity to investigate the allegations, informally eliminate any discrimination, and minimize costly litigation." *Vincent*, 895 S.W.2d at 473. The time limit for filing a complaint

with the Commission is mandatory and jurisdictional. *See Specialty Retailers, Inc.*, 933 S.W.2d at 492; *Schroeder*, 813 S.W.2d at 488; *O'Bryant*, 949 S.W.2d at 417; *Vincent*, 895 S.W.2d at 473. State law claims of employment discrimination are time-barred when filed after the 180–day period, while the same claims brought under federal law would be timely if filed within 300 days of the alleged discriminatory conduct. *See Pope v. MCI Telecommunications Corp.*, 937 F.2d 258, 263–64 (5th Cir.1991), *cert. denied*, 504 U.S. 916, 112 S.Ct. 1956, 118 L.Ed.2d 558 (1992).

■ The courts, however, have recognized an equitable exception " ' "where the unlawful employment practice manifests itself over time, rather than as a series of discrete acts." ' " *Webb v. Cardiothoracic Surgery Assocs. of N. Tex., P.A.*, 139 F.3d 532, 537 (5th Cir.1998) (quoting *Waltman v. International Paper Co.*, 875 F.2d 468, 474 (5th Cir.1989) (quoting *Abrams v. Baylor College of Med.*, 805 F.2d 528, 532 (5th Cir.1986))); *see Wal–Mart Stores, Inc.*, 979 S.W.2d at 41. In order to extend the statute of limitations under this exception, known as a continuing violation, the plaintiff must show a series of related acts, one or more of which falls within the limitations period. *See Huckabay v. Moore*, 142 F.3d 233, 238–39 (5th Cir.1998) (citing *Messer*, 130 F.3d at 134–35); *Webb*, 139 F.3d at 537; *Waltman*, 875 F.2d at 474; *Wal–Mart Stores, Inc.*, 979 S.W.2d at 41; *see also Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). "Although there is no definitive standard for what constitutes a continuing violation, the plaintiff must demonstrate more than a series of discriminatory acts. He must show an organized scheme leading to and including a present violation." *Huckabay*, 142 F.3d at 239; *see Berry v. Board of Supervisors*, 715 F.2d 971, 981 (5th Cir.1983). "[I]t is the cumulative effect of the discriminatory practice, rather than any discrete occurrence, that gives rise to the cause of action." *Huckabay*, 142 F.3d at 239; *see Messer*, 130 F.3d at 135; *Glass v. Petro–Tex Chem. Corp.*, 757 F.2d 1554, 1561 (5th

Cir.1985). "A continuing violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period." *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir.1998) (citing *Dasgupta v. University of Wis. Bd. of Regents*, 121 F.3d 1138, 1139 (7th Cir.1997) (citing *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 481–82 (3d Cir.1997))); *Taylor v. FDIC*, 132 F.3d 753, 765 (D.C.Cir.1997); *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1167 (7th Cir.1996); *Berry*, 715 F.2d at 981. Application of this theory relieves a plaintiff from the burden of proving that the entire violation occurred within the limitations period, as long as she can show that at least one of the alleged discriminatory acts occurred within the applicable time period. *See Huckabay*, 142 F.3d at 238 (citing *Messer*, 130 F.3d at 135); *Webb*, 139 F.3d at 537.

■ The Fifth Circuit has adopted a multi-factor test to assess whether a continuing violation is implicated. *See Huckabay*, 142 F.3d at 239; *Berry*, 715 F.2d at 981. These factors include subject matter, frequency, and permanence:

This inquiry, of necessity, turns on the facts and context of each particular case. Relevant to the determination are the following three factors, which we discuss, but by no means consider to be exhaustive. The first is subject matter. Do the alleged facts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (e.g., a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence which should trigger an employee's awareness and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of

the act is to be expected without being dependent on a continuing intent to discriminate?

*Id.; accord Huckabay,* 142 F.3d at 239. "Importantly, however, the particular context of individual employment situations requires a fact-specific inquiry that cannot easily be reduced to a formula." *Id.*

"The core idea of the continuing violation theory is that 'equitable considerations may very well require that the filing periods not begin to run until facts supportive of a Title VII charge or civil rights action are or should be apparent to a reasonably prudent person similarly situated.'" *Webb,* 139 F.3d at 537 (quoting *Glass,* 757 F.2d at 1560–61). "'The focus is on what event, in fairness and logic, should have alerted the average lay person to act to protect his rights.'" *Id.* (quoting *Glass,* 757 F.2d at 1561 (citations omitted)); *see also Messer,* 130 F.3d at 135; *Abrams,* 805 F.2d at 534. If a plaintiff knows or with the exercise of reasonable diligence would have known that she suffered from discrimination, she "may not sit back and accumulate all the discriminatory acts and sue on all within the statutory period applicable to the last one." *Moskowitz v. Trustees of Purdue Univ.,* 5 F.3d 279, 282 (7th Cir.1993). Thus, as the First Circuit noted:

> A knowing plaintiff has an obligation to file promptly or lose his claim. This can be distinguished from a plaintiff who is unable to appreciate that he is being discriminated against until he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern.

*Sabree,* 921 F.2d at 402; *Martin v. Frank,* 788 F.Supp. 821, 826 (D.Del.1992).

In the case at bar, it is undisputed that Martin waited until December 9, 1997, to file a charge of discrimination with the EEOC. Therefore, unless a continuing violation is established, Martin may only recover for conduct that occurred on or after June 9, 1997, 180 days before the filing of her charge. In her affidavit, Martin states:

I observed and experienced the effects of offensive racial and/or sexist communications and actions throughout my employment with Kroger. For example, Nancy Taylor, a white Co–Manager stated on or about October 18, 1992 that she needed to "nigger-rig" a copier because she could not get it to work. Another Kroger employee indicated to Taylor that she should watch her language because I was present, but Taylor replied that she did not care about me standing there. . . .

My store management training program mentor singled me out and told me on or about November 11, 1992 that I would always have problems at Kroger, that I probably would not be "good enough," and that I had a slim chance of ever succeeding in employment with Kroger. Others in the store management training program at that time were not given similar discouraging advice. On or about January 20, 1993, Store Manager Clif Shears (white) told me that my degree did not mean anything in the eyesight of many within Kroger's organization and that I would not receive any special privileges because of my race. . . . Additionally, in 1993, Randy Kotlowski [sic] (white), an Engineer, asked me if my recently deceased father lived in [the] same household with is [sic] children, whether he had insurance, and whether he had a job. In February 1996, during a work-related conversation between me and Co–Manager Freddy Aguilar (Hispanic), Aguilar told me "I don't give a damn that your ass is black" and said that "I will knock your black ass out." I reported each of these statements to Hembree and other Kroger employees such as Linda Murphy (black) and Roman Williams (black).

Not only was I subjected to offensive racist and sexist communications and behavior by Kroger employees, I also had to endure such treatment from contractors on the various projects that were assigned to me. . . .

These assertions indicate actual knowledge of perceived discriminatory treatment for over five years before Martin filed her charge of employment discrimination. *See Waltman,* 875 F.2d at 476. The events as Martin describes them would have alerted the average lay person to act to protect her rights. *See Alldread v. City of Grenada,* 988 F.2d 1425, 1432 (5th Cir.1993). "A knowing plaintiff has the obligation to file promptly or lose [her] claim." *Smith v. Bath Iron Works Corp.,* 943 F.2d 164, 166 (1st Cir.1991). If Martin believed that Kroger was discriminating against her, she should have reacted well before December 1997. "Waiting to see what would happen next was pointless; the harm, if any, was already inflicted." *Rush,* 113 F.3d at 483. Accordingly, the continuing violation theory is not available to Martin, and consequently, her claims of racial and sexual discrimination and retaliation based on events occurring prior to June 9, 1997, are time-barred.

### 2. Individual Liability of Supervisors

■ A review of the record reveals that Martin's claims against Hembree arise solely from his actions as a supervisory employee of Kroger. Under Texas law, employees cannot be held personally liable under the TCHRA, as the Act does not create a cause of action against supervisors or individual employees. *See Thompson,* 838 F.Supp. at 1153; *City of Austin v. Gifford,* 824 S.W.2d 735, 742 (Tex.App.—Austin 1992, no writ). Similarly, it is well settled in the Fifth Circuit that individual employees, even those functioning in a supervisory capacity, cannot be held personally liable under Title VII, as they are not "employers" as that term is defined in Title VII. *See Grant v. Lone Star Co.,* 21 F.3d 649, 652–53 (5th Cir.), *cert. denied,* 513 U.S. 1015, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994); *accord Garcia v. Elf Atochem N. Am.,* 28 F.3d 446, 451 n. 2 (5th Cir.1994); *Clanton v. Orleans Parish Sch. Bd.,* 649 F.2d 1084, 1099 (5th Cir. 1981).

Here, Martin has submitted no evidence to indicate that Hembree qualifies as an employer for the purposes of liability under the TCHRA. Among the various parties subject to liability under the TCHRA, the Texas Legislature could have made an individual employee committing or engaging in discriminatory acts liable for damages. It did not. Therefore, Martin's employment discrimination and retaliation claims against Hembree in his individual capacity must be dismissed for failure to state a claim upon which relief can be granted.

### C. Race and Gender Discrimination Under The TCHRA

#### 1. Burden of Proof

■ In *McDonnell Douglas* and *Burdine,* the United States Supreme Court outlined the evidentiary framework generally applicable to employment discrimination cases. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This method of analysis is utilized for both Title VII and TCHRA claims. *See Williams,* 98 F.3d at 180; *see also Schroeder,* 813 S.W.2d at 485. Where, as here, there is no direct evidence of discrimination, the plaintiff must initially establish a *prima facie* case by satisfying a multi-factor test from which a discriminatory motive may be inferred, thus creating a rebuttable presumption of intentional discrimination. *See Wallace,* 80 F.3d at 1047 (citing *Meinecke v. H & R Block,* 66 F.3d 77, 83 (5th Cir.1995)); *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1087 (5th Cir.1994) (citing *Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089). " 'To establish a *prima facie* case, a plaintiff need only make a very minimal showing.' " *Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 41 (5th Cir.1996) (quoting *Thornbrough v. Columbus & Greenville R.R. Co.,* 760 F.2d 633, 639 (5th Cir.1985)).

Once the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate—but not prove—a

legitimate, nondiscriminatory reason for its employment decision. *See McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817; *Davis,* 14 F.3d at 1087; *see also Marcantel v. Department of Transp. & Dev.,* 37 F.3d 197, 199 (5th Cir.1994). "The employer must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, 'if believed by the trier of fact,' would support a finding that unlawful discrimination was not the cause of the employment action." *Bauer v. Albemarle Corp.,* 169 F.3d 962, 966 (5th Cir.1999) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). If the employer meets its burden, the *prima facie* case is dissolved, and the burden shifts back to the plaintiff to establish that the reason proffered by the employer is merely a pretext for discrimination. *See McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817; *Travis v. Board of Regents,* 122 F.3d 259, 263 (5th Cir.1997), *cert. denied,* 522 U.S. 1148, 118 S.Ct. 1166, 140 L.Ed.2d 176 (1998); *Price v. Marathon Cheese Corp.,* 119 F.3d 330, 337 (5th Cir. 1997); *Marcantel,* 37 F.3d at 200; *Moham v. Steego Corp.,* 3 F.3d 873, 875 (5th Cir. 1993), *cert. denied,* 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). To demonstrate a "pretext for discrimination," the plaintiff must show both that the employer's proffered reason is false and that discrimination was the real reason for its actions. *See Hicks,* 509 U.S. at 515, 113 S.Ct. 2742. "The plaintiff now must have ' "the full and fair opportunity to demonstrate," through presentation of [her] own case and through cross-examination of the defendant's witnesses, "that the proffered reason was not the true reason for the employment decision," ' and that unlawful discrimination was." *Bauer,* 169 F.3d at 966 (quoting *Hicks,* 509 U.S. at 507–08, 113 S.Ct. 2742 (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089)). At all times, however, the plaintiff has the ultimate burden to prove intentional discrimination. *See Hicks,* 509 U.S. at 507, 113 S.Ct. 2742; *Marcantel,* 37 F.3d at 200.

The Fifth Circuit has formulated the plaintiff's burden under *Hicks* as one of establishing that the employer's nondiscriminatory reason is not credible and that an unlawful discriminatory intent motivated the employer's action. *See Walton v. Bisco Indus., Inc.,* 119 F.3d 368, 370 (5th Cir.1997); *Polanco v. City of Austin,* 78 F.3d 968, 977–76 (5th Cir.1996); *Ray v. Iuka Special Mun. Separate Sch. Dist.,* 51 F.3d 1246, 1249 (5th Cir.1995). "Under *Hicks,* '[i]t is not enough, in other words, to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.' " *Id.* (quoting *Hicks,* 509 U.S. at 519, 113 S.Ct. 2742); *see Walton,* 119 F.3d at 370. "The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1091 (5th Cir.1995); *accord Odom v. Frank,* 3 F.3d 839, 850 (5th Cir.1993); *Little v. Republic Ref. Co.,* 924 F.2d 93, 97 (5th Cir.1991). In the context of a motion for summary judgment, "a jury issue will be presented and a plaintiff can avoid summary judgment ... if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that [plaintiff's protected status] was a determinative factor in the actions of which plaintiff complains." *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir.1996); *see Ontiveros v. Asarco, Inc.,* 83 F.3d 732, 734 (5th Cir.1996). The burden-shifting approach may be dispensed with altogether, however, if the plaintiff is able to demonstrate intentional discrimination by direct evidence of discriminatory motive. *See Wallace,* 80 F.3d at 1047–48; *Kendall v. Block,* 821 F.2d 1142, 1145 (5th Cir.1987); *Ramirez v. Sloss,* 615 F.2d 163, 168 (5th Cir.1980).

2. *Prima Facie Case of Discrimination*

a. *Disparate Treatment in Terms and Conditions of Employment*

Martin claims that while employed by Kroger, she was treated adversely as com-

pared to white or male employees in a number of respects. "To establish a *prima facie* case of discrimination ..., a plaintiff may prove her claim either through direct evidence, statistical proof, or the test established by the Supreme Court in *McDonnell Douglas....*" *Urbano v. Continental Airlines, Inc.,* 138 F.3d 204, 206 (5th Cir.1998). Under the latter method of proof, to establish a *prima facie* case of disparate treatment, the plaintiff must show that:

(1) she is a member of a protected class;

(2) she is qualified for the position;

(3) she suffered an adverse employment action; and

(4) others outside the class who are similarly situated were treated more favorably.

*See id.; Nieto v. L & H Packing Co.,* 108 F.3d 621, 623 n. 5 (5th Cir.1997); *Waggoner v. City of Garland,* 987 F.2d 1160, 1163–64 (5th Cir.1993); *Johnson v. Chapel Hill Indep. Sch. Dist.,* 853 F.2d 375, 381 (5th Cir.1988); *Thornbrough,* 760 F.2d at 639.

Martin's ability to meet the first and second elements of a *prima facie* case under a disparate treatment theory is uncontested. As an African–American female, Martin is indisputably a member of two protected classes. She appears to be qualified for the position of facility engineer in view of her engineering degree and her five years of experience. Kroger, however, contests Martin's ability to show that she suffered an adverse employment action, aside from her termination, or that similarly situated, non-black employees were treated more favorably.

■ The anti-discrimination provisions of the TCHRA and Title VII prohibit adverse employment actions based on an employee's protected status. *See* TEX.LAB. CODE ANN. § 21.051; 42 U.S.C. § 2000e–2. In situations where the plaintiff does not allege severe and pervasive harassment, actionable adverse employment actions are generally limited to "tangible employment action[s] [that] constitute[ ] a significant change in employment status, such as hiring, firing, failing to promote, reassign-

ment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998); *see Watts v. Kroger Co.,* 170 F.3d 505, 510 (5th Cir.1999) (change in work schedule and being asked to perform tasks not previously assigned are not adverse employment actions); *Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 885 (6th Cir.1996) (reassignment to different division is not adverse employment action); *Yates v. Avco Corp.* 819 F.2d 630, 638 (6th Cir.1987) (transfer without reduction in pay or benefits does not constitute adverse action). " 'Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions.' " *Messer,* 130 F.3d at 140 (quoting *Dollis v. Rubin,* 77 F.3d 777, 781 (5th Cir.1995)); *accord Webb,* 139 F.3d at 540; *Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707–08 (5th Cir.), *cert. denied,* 522 U.S. 932, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997); *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981).

■ An ultimate employment decision, in itself or through its direct consequences, must effect a material change in the terms or conditions of employment. *See Ledergerber v. Stangler,* 122 F.3d 1142, 1144 (8th Cir.1997). " 'Although actions short of termination may constitute an adverse employment action within the meaning of the statute, not everything that makes an employee unhappy is an actionable adverse action.' " *Greaser v. Missouri Dep't. of Corrections,* 145 F.3d 979, 984 (8th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 620, 142 L.Ed.2d 559 (1998) (quoting *Manning v. Metropolitan Life Ins. Co.,* 127 F.3d 686, 689 (8th Cir.1997)); *accord Montandon v. Farmland Indus., Inc.,* 116 F.3d 355, 359 (8th Cir.1997); *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir. 1996). Interlocutory or mediate decisions,

even those that can lead to an ultimate employment decision, are not adverse employment actions for purposes of Title VII. *See Mattern*, 104 F.3d at 708. The Seventh Circuit has explained:

> "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities.... A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."

*Fortier v. Ameritech Mobile Communications, Inc.*, 161 F.3d 1106, 1112 n. 7 (7th Cir.1998) (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993)); *Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir.1996).

"[E]mployment actions are not adverse where pay, benefits, and level of responsibility remain the same." *Watts*, 170 F.3d at 512; *see Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994) (reassignment to a different position without any reduction in title, salary, or benefits was not adverse employment action although new position involved different duties and was more stressful); *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 457 (7th Cir.1994) (semantic change in title and "bruised ego" did not constitute adverse employment action where pay, benefits, and level of responsibility remained the same); *Crady*, 993 F.2d at 136 (no adverse action where job transfer merely caused personal inconvenience or altered job responsibilities). Accordingly, a supervisor's treatment of an employee "rudely and uncivilly does not amount to an adverse employment action." *Webb*, 139 F.3d at 540. Even a "verbal threat of being fired" is not an adverse employment action because of its "lack of consequence." *Mattern*, 104 F.3d at 708. While it may increase an employee's chance that she will eventually suffer an adverse employment action, such

a threat, in itself, is not an ultimate employment decision and does not "rise above having mere tangential effect on a possible future ultimate employment decision." *Id.* Similarly, negative performance evaluations, even if undeserved, are not adverse employment actions giving rise to actionable discrimination claims. *See Speer v. Rand McNally & Co.*, 123 F.3d 658, 664 (7th Cir.1997); *Smart*, 89 F.3d at 442; *see also Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir.1996); *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 896 (10th Cir.1994). "[N]egative performance evaluations, standing alone, cannot constitute an adverse employment action." *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir.1998) (citing *Smart*, 89 F.3d at 442); *accord Dela Rosa v. Scottsdale Mem. Health Sys., Inc.*, 132 F.3d 38, 1997 WL 753359, at *2 n. 3 (9th Cir. Dec. 2, 1997), *cert. denied,* — U.S. ——, 119 S.Ct. 50, 142 L.Ed.2d 38 (1998) (citing *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir.1994), *cert. denied*, 513 U.S. 1082, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995)); *Montandon*, 116 F.3d at 359.

Here, Martin attempts to show that similarly situated, non-black, male employees were treated more favorably than she by relying on allegations of non-material, tangential events and actions, most of which find no support in the record. She contends in her petition:

> Defendant Hembree further promoted, encouraged, condoned, approved and ratified the discriminatory acts of others committed against Plaintiff. Defendant Hembree frequently and repeatedly acted to undermine Plaintiff's work by countermanding decisions which Plaintiff made within the course and scope of her job duties and responsibilities but with which decisions Plaintiff's subordinate employees, including Lead Carpenter Terry Hildebrandt, disagreed. Even while erecting artificial barriers to Plaintiff's successful performance, Defendant Hembree increased the amount of responsibility Plaintiff had with regard to

Defendant Kroger's assets and legitimate business interests by assigning Plaintiff to direct construction projects of greater scope and budget. However, after Plaintiff exceeded expectations and completed projects early and within or under budget, Defendant Hembree endeavored to shift to [sic] credit for Plaintiff's accomplishments to non-minority, male employees.

Martin also complains that she received lower pay than non-black, male engineers. In essence, Martin alleges that Kroger engaged in actionable conduct with respect to her compensation, her authority as a supervisor, her workload, and the attribution of credit for her accomplishments.

■■ With regard to compensation, Martin claims in her petition that "Hembree caused, facilitated and/or participated in disparate compensation practices" and that she was "compensated at a lower rate than males in her job classification, regardless of the amount and quality of work she performed and irrespective of her greater training and education in the engineering field." Yet, in her charge of discrimination filed with the TCHR and EEOC, Martin made no mention of unequal compensation. It is well settled that courts are without jurisdiction to consider claims brought under the TCHRA or Title VII as to which an aggrieved party has not first exhausted his administrative remedies by filing a charge of discrimination with the TCHR or EEOC. *See Caballero,* 858 S.W.2d at 360; *Schroeder,* 813 S.W.2d at 486; *see also* 42 U.S.C. § 2000e–5(f)(1); *Dollis,* 77 F.3d at 781; *National Ass'n of Gov't Employees v. City Pub. Serv. Bd.,* 40 F.3d 698, 711 (5th Cir.1994); *Clark v. Kraft Foods, Inc.,* 18 F.3d 1278, 1279 (5th Cir.1994); *Tolbert v. United States,* 916 F.2d 245, 247–48 (5th Cir.1990); *Patridge v. Runyon,* 899 F.Supp. 291, 292 (N.D.Tex. 1995). Civil complaints filed under the TCHRA or Title VII may only encompass " 'discrimination like or related to allegations contained in the [TCHR or EEOC] charge and growing out of such allegations during the pendency of the case before the Commission.' " *National Ass'n of Gov't*

*Employees,* 40 F.3d at 711 (quoting *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir.1970)); *see Dollis,* 77 F.3d at 781; *Fine v. GAF Chem. Corp.,* 995 F.2d 576, 578 (5th Cir.1993); *Young v. City of Houston,* 906 F.2d 177, 179 (5th Cir.1990).

The primary purpose of the charge is to provide notice to the respondent of the discrimination alleged and to activate the voluntary compliance and conciliation functions of the EEOC. *See Terrell v. United States Pipe & Foundry Co.,* 644 F.2d 1112, 1123 (5th Cir.1981), *vacated on other grounds,* 456 U.S. 968, 102 S.Ct. 2229, 72 L.Ed.2d 841 (1982); *Sanchez,* 431 F.2d at 466; *Hebert v. Monsanto Co.,* 1981 WL 313, at *3 (S.D.Tex. Sept.2, 1981), *aff'd,* 682 F.2d 1111 (5th Cir.1982). The charge triggers an investigation by the EEOC so, through a conciliation process, voluntary compliance may be obtained and discriminatory practices and policies eliminated. *See Terrell,* 644 F.2d at 1123; *Sanchez,* 431 F.2d at 466. Requiring the plaintiff first to state his allegations of employment discrimination in an EEOC charge serves "Congress' intention to promote conciliation rather than litigation in the Title VII context." *Burlington Indus., Inc.,* 118 S.Ct. at 2270. Accordingly, the scope of the complaint is limited to " 'the discrimination stated in the charge itself or developed in the course of a reasonable investigation of that charge.' " *National Ass'n of Gov't Employees,* 40 F.3d at 712 (quoting *King v. Seaboard Coast Line R. Co.,* 538 F.2d 581, 583 (4th Cir.1976)); *see Clark,* 18 F.3d at 1279–80; *Terrell,* 644 F.2d at 1123; *Sanchez,* 431 F.2d at 465–66. Thus, the failure to assert a claim of discrimination in an EEOC charge and/or its lack of development in the course of a reasonable investigation of that charge precludes the claim from later being brought in a civil suit. *See National Ass'n of Gov't Employees,* 40 F.3d at 711–12; *Young,* 906 F.2d at 179; *Sanchez,* 431 F.2d at 465–66. Here, pay is not mentioned or even alluded to in the charge, and Martin's unequal compensation claim cannot be said to be reason-

ably related to the specific acts of racial and sexual discrimination set forth in her charge of discrimination, which are directed at alleged racial slurs, undermining her authority, Hildebrandt's purported problem with working with females, and Martin's placement on probation. *See Butts v. City of New York Dep't of Housing Preservation & Dev.*, 990 F.2d 1397, 1401–03 (2d Cir.1993). Thus, because Martin has failed to exhaust her administrative remedies on this issue, the court is without subject matter jurisdiction over her compensation claim. *See Snooks*, 996 F.Supp. at 690 (citing *Thornton v. Neiman Marcus*, 850 F.Supp. 538, 541 (N.D.Tex.1994)); *see also O'Bryant*, 949 S.W.2d at 417.

Martin's compensation claim is also time-barred. Her allegations of unequal pay pre-date the 180–day limitations period by months or years. *See* Tex.Lab.Code Ann. § 21.202(a); *Specialty Retailers, Inc.*, 933 S.W.2d at 492; *Schroeder*, 813 S.W.2d at 486; *Davis*, 979 S.W.2d at 41; *Vincent*, 895 S.W.2d at 473; *Eckerdt*, 802 S.W.2d at 71. At deposition, Martin testified:

Q: "Plaintiff was compensated at a lower rate than males in her job classification, regardless of the amount and quality of work." What facts do you have to support that claim? You need to explain that to us.

A: I asked the human resources manager at the time, Fred Smith, was he indeed being paid more money.

Q: Who is "he"?

A: The other guy, the other engineer prior to me, Steven. And Fred says yes.

Q: Being paid more than you when you started the job?

A: Yes.

Q: All right. Other than your allegation that Mr. Smith told you that this Steve Person was paid at a higher rate than you, is there anybody else that you're complaining of that was compensated at a higher rate than you that was your classification?

A: I can't think of any. The other—

Q: Well, who are the other engineers that you worked with while you were at Kroger?

A: What are their names?

Q: Right. Let's go through one at a time and ask you if that person was paid more than you, if they were of the same job classification and same rank, et cetera.

A: Brett Smollen, he's an engineer. Cliff Brown.

Q: Now, Brett Smollen was promoted to a higher position; is that right? He became the assistant manager of engineering?

A: Are we talking prior to his promotion?

\*　　\*　　\*　　\*　　\*　　\*

Q: What was your question [to Fred Smith]? Did you ask him was every single engineer paid more that I and he said yes?

A: No. My question was if—if I'm not qualified enough, how do we qualify moneys and is every male hired—that is hired in Kroger at the same level I am paid more. And he said yes.

\*　　\*　　\*　　\*　　\*　　\*

Q: Well, did you routinely go to HR to ask about salaries of people who no longer worked at Kroger and hadn't worked there for a year or more?

A: When I was constantly being told by employees that he wasn't qualified and he was making plenty of money, then I wanted to know what plenty of money meant for a guy with no degree versus me with one. Maybe I should have been making plenty of money.

Q: Who were the employees who told you that?

A: Ray Patch was the one that did most of the talking.

Q: He didn't work in human resources, did he?

A: No. But none of the other people that got confidential information worked there either.

\* \* \* \* \* \*

Q: I'm asking you what makes you think that this person Ray Patch knew for a fact what T. Stevens' salary was and what your salary was, for that matter.

A: Evidently he was getting the information from someone in human resources.

Q: Okay. You understand you're under oath. I'm not asking you to guess. I'm going to object to the extent you're speculating. I'm asking you what facts you have to support this claim that T. Stevens or that Ray Patch knew for a fact T. Stevens was paid more than you.

A: I never asked for evidence.

Q: You don't know for sure?

A: Right.

In addition to Martin's admission that she had no facts to support her unequal compensation claim, the record reflects that the evidence upon which she attempts to rely arose years before the limitations period, as T. Stevens was terminated in 1993 and Smith had ceased to be the Human Resources Manager long before June 9, 1997.

In an apparent effort to resurrect this claim, Martin points to a handwritten note dated February 27, 1997, also pre-dating the limitations period. This document, ostensibly signed by Anderson, purports to list the grade level and bonus levels of three Kroger engineers. It states, in part:

(1) Clifton Brown should be a level 35 with a bonus level of $6,000.

(2) Elaine Martin should be a level 31 with a bonus level of $4,000.

(3) Randy Kottlowski should be a level 37 with a bonus level of $7,500.

Yet, aside from being untimely, Martin has failed to establish the authenticity of this document. This writing, therefore, cannot be considered competent evidence of Kroger's compensation practices. *See King v.*

*Dogan,* 31 F.3d 344, 346 (5th Cir.1994) ("[u]nauthenticated documents are improper as summary judgment evidence") (citing *Duplantis v. Shell Offshore, Inc.,* 948 F.2d 187, 192 (5th Cir.1991)).

 Furthermore, in addition to is speculative nature, much of this purported evidence is merely hearsay and, as such, is inadequate to defeat summary judgment. *See Garcia v. Reeves County,* 32 F.3d 200, 204 (5th Cir.1994); *Rock v. Huffco Gas & Oil Co., Inc.,* 922 F.2d 272, 283 (5th Cir. 1991); *see also Barhan v. Ry–Ron Inc.,* 121 F.3d 198, 202 (5th Cir.1997). Moreover, even assuming that some of the other engineers at Kroger were paid more than Martin, this alone does not give rise to an inference of race or sex discrimination—especially in light of Martin's lack of prior experience and documented performance deficiencies. There is no evidence concerning the level of experience or education of these other engineers, their productivity, or the quality of their work. Thus, if Martin's compensation claim were properly before the court and not time-barred, she still has failed to proffer competent evidence of discriminatory compensation practices.

Martin's allegations about undermining her authority as a supervisor, increasing her workload, and giving credit for her work to undeserving non-minorities, simply do not rise to the level of adverse employment actions for which the anti-discrimination provisions of the TCHRA provide relief. These purported actions effected no direct, material change in Martin's terms and conditions of employment; at most, they had only a tangential effect. Furthermore, Martin has provided no evidence that male or non-black supervisors or employees were treated more favorably with regard to their authority, workload, or recognition. At deposition, Martin conceded that she has no evidence to support her claim that non-black, male engineers received more favorable treatment with respect to the exercise of their authority:

Q: What makes you think that Mr. Hembree allowed Terry Hildebrandt to undermine your authority?

A: When Terry would tell me or some of the other workers what he wasn't going to do and he got it approved through Charlie to do that.

Q: Do you know whether Terry got any decisions approved through Charlie with respect to any of the other three engineers.

A: I know of mine that I questioned Charlie on; and he said, yeah, he told him to do it or not to do it. But I can't say about the others.

Q: That's what I'm asking is, you don't know, then, whether Terry might have gone to Mr. Hembree concerning projects he was working on with either of these other engineers, Randy, Brett, or Cliff, and gotten changes approved through Mr. Hembree that way?

A: No, I don't know.

Martin also testified that Hembree allowed Hildebrandt, without Martin's authorization, to spend money and "take charge and override" her judgment. Martin, however, admitted at deposition that she has no evidence to suggest that Hembree did not permit Hildebrandt to do the same thing with regard to the white, male engineers or that he treated non-minorities more favorably in this regard.

While Martin also alleges that Hembree discriminated against her by assigning her to construction projects of greater scope and budget than other engineers, she conceded at deposition that she has no evidence that the other engineers, in fact, had a lesser work load. When questioned about this issue, Martin testified:

Q: Ms. Martin, ... How many projects did you work on in 1994, approximately?

A: Between four and six.

Q: Do you know if that number was any different from the number of projects on which other engineers

worked around the same time frame?

A: I don't know.

Q: So you don't know if you were given any more or less projects?

A: Right.

\* \* \* \* \* \*

Q: Do you have any reason to believe as you sit here today that you got a much higher work load than your co-workers, or do you stand by your testimony that you-all received approximately the same amount of work?

A: We received approximately the same amount of projects.

Furthermore, Martin acknowledged at deposition that a similar, in-house remodeling project had previously been assigned to Kottlowski, a white male.

In addition, Martin offers insufficient evidence to support her claim that non-minority employees received credit for her work. At deposition, Martin testified:

Q: And what was the context in which Mr. Hembree gave credit to Mr. Hildebrandt? Was this at a meeting? Did you-all have a party to celebrate Seabrook? I mean, did this come up? What makes you think that Mr. Hembree credited Terry Hildebrandt with Seabrook?

A: Because I was told by the store manager that Terry completed the job successfully and within budget and all the work was completed and the scope and the spec was done properly and everything was completed, when, actually, it wasn't.

Q: And who told you? The store manager?

\* \* \* \* \* \*

A: Ida Spearman [told] me that Charlie praised Terry in completing the project.

\* \* \* \* \* \*

Q: Is he the only non-minority male employee that you're talking about ...?

A: No. There were others, but the subcontractors, the electrician, and the painter, they are non-minority. But they're subcontractors.

Q: Well, did Mr. Hembree—

A: All the other male employees in Terry's group. I can't think of his right-hand man. Chris, I believe. I can't think of his last name.

Q: And who told that you [sic] Chris ... was given credit for the Seabrook project?

A: Ida.

While this evidence suggests that several non-minority, male employees and subcontractors received praise for their contribution to the Seabrook remodeling project, Martin fails to demonstrate that these individuals received credit for her work. It is apparent that she did not personally perform any of the hands-on work on the remodeling project and that Hildebrandt, the superintendent of the Seabrook project, as well as Martin, deserved credit for completing the job. Moreover, these alleged statements are merely hearsay and, as such, cannot defeat summary judgment. *See Rock*, 922 F.2d at 283. Inadmissible hearsay is not "enough to get past the summary judgment hurdle." *Garcia*, 32 F.3d at 204; *see also Barhan*, 121 F.3d at 202.

Thus, Martin has not adduced sufficient evidence to support her contention that she suffered an adverse employment action with respect to her compensation, the exercise of her authority as a supervisor, her workload, or the attribution of credit for her work. She has made no showing that similarly situated, non-black males were treated more favorably than she with regard to these issues. Accordingly, Martin has not established a *prima facie* case of disparate with respect to the terms and conditions of her employment at Kroger.

#### b. *Failure to Promote*

While Martin now claims that racial and/or sexual discrimination motivated Kroger to promote Smollen, instead of her, to the position of assistant manager of the Facilities Engineering Department, she did not assert this claim in her charge of discrimination. In fact, the charge makes no reference to Smollen, the assistant manager's job, or being denied a promotion. Such a claim is not like or related to the allegations contained in the charge, which focus on alleged racial epithets, affronts to Martin's authority, Hildebrandt's difficulty in working with a female, and Martin's ninety-day probation. Martin's failure to promote claim cannot be deemed to fall within the scope of an investigation that reasonably could have been expected to grow out of the charge. *See Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir.1995); *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 589 n. 8 (11th Cir.), *cert. denied*, 513 U.S. 919, 115 S.Ct. 298, 130 L.Ed.2d 212 (1994); *Butts*, 990 F.2d at 1403. As discussed above, Martin's failure to include this issue in her charge renders the court without subject matter jurisdiction over her failure to promote claim. *See Snooks*, 996 F.Supp. at 690; *Thornton*, 850 F.Supp. at 541; *O'Bryant*, 949 S.W.2d at 417. Similarly, because Smollen was promoted during the first quarter of 1997, Martin's failure to promote claim is time-barred. *See* TEX.LAB.CODE ANN. § 21.202(a); *Specialty Retailers, Inc.*, 933 S.W.2d at 492; *Schroeder*, 813 S.W.2d at 486; *Davis*, 979 S.W.2d at 41; *Vincent*, 895 S.W.2d at 473; *Eckerdt*, 802 S.W.2d at 71.

Assuming the court had jurisdiction over this claim, to prevail, Martin would be required to establish the following *prima facie* case:

(1) she is a member of a protected group;

(2) she applied for a position for which she was qualified;

(3) she was rejected; and

(4) after she was rejected, the employer promoted or continued to seek applicants with her qualifications not in the protected group.

*See Scales v. Slater,* 181 F.3d 703, 709 (5th Cir.1999); *Grimes v. Texas Dep't of Mental Health & Mental Retardation,* 102 F.3d 137, 140 (5th Cir.1996); *Anderson v. Douglas & Lomason Co., Inc.,* 26 F.3d 1277, 1297 (5th Cir.1994), *cert. denied,* 513 U.S. 1149, 115 S.Ct. 1099, 130 L.Ed.2d 1066 (1995); *Allison,* 60 F.Supp.2d at 593 (TCHRA and Title VII). "When an individual infers discrimination from an employer's failure to promote her, [courts] apply a modified version of the burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas.*" *Scales,* 181 F.3d at 712.

 Here, Martin's ability to establish the first, third, and fourth elements of a *prima facie* case of discriminatory failure to promote under the TCHRA is uncontested. Martin is an African–American female who was rejected for the position of assistant manager in Kroger's Facility Engineering Department. Instead, Kroger promoted Smollen, a white male, to the assistant manager position. Kroger maintains, however, that Martin was not qualified for the position and, thus, she cannot establish the second element of a *prima facie* case.

Martin contends that she should have been awarded the assistant manager position because she had greater seniority than Smollen. In her response to the summary judgment motion, Martin complains that she "was hired before Brett Smollen (white), but although Hembree claims to have considered Martin for promotion, Hembree promoted Smollen to a supervisory position over Martin." Martin points to Hembree's deposition testimony as support for her theory:

Q: What race is Brett Smollen?

A: He's white as far as I know.

Q: He's a white male?

A: He looks like it.

Q: He was hired after Elaine Martin was hired, wasn't he?

A: That's correct.

\* \* \* \* \* \*

Q: Would you agree with me that Mr. Smollen had less experience with Kroger Company than Elaine Martin?

MS. TETZLAFF: When? At the time of the promotion?

MR. KRENEK: At the time Elaine Martin was terminated.

A: No.

Q: Why is that?

A: Well, Elaine missed a—to be technically accurate, she missed quite a bit of time during her pregnancy, probably—almost—I'm just guessing, it could be a very similar amount of time to the difference in their—in their hire dates. Secondly, Brett Smollen was a project engineer at his previous job for approximately two years before joining Kroger. So he brought that experience with him when he came to work.

\* \* \* \* \* \*

Q: Did you ever consider Elaine Martin for the position of assistant manager of engineering?

A: Yes.

\* \* \* \* \* \*

Q: Well, was Elaine Martin competent to hold the position of assistant manager of engineering?

A: No.

\* \* \* \* \* \*

Q: Were you ever to the point where, in your mind, you were going to give the position of assistant manager of engineering to Elaine Martin?

A: No.

Q: You never seriously thought about offering her the position of assistant manager of engineering, did you?

A: ... I would have liked nothing better than for Elaine's performance to be such that I would recommend

her for promotion to assistant manager.

While Martin contends that Hembree's testimony supports her claim, it does not. Although she is clearly a member of a protected group and was passed over for promotion in favor of an applicant not in the protected group, Hembree's testimony fails to demonstrate that she was qualified for the position. In fact, it is inconceivable how Martin, who consistently received below-average performance reviews in her existing position, could contend that she was wrongfully denied a promotion. Moreover, Hembree's testimony reflects that Martin and Smollen were not similarly situated. Indeed, he was better qualified than Martin. *See Scales,* 181 F.3d at 712. The record reflects that Martin and Smollen actually worked for Kroger for approximately the same length of time, but unlike Martin, who had no previous project engineering experience when she began her employment with Kroger, Smollen had two years of prior experience. Also, unlike Martin, there is no indication that Smollen had difficulties performing his job or received repeated evaluations critical of his performance. In any event, Martin's position on the seniority roster has little bearing on the quality of her performance or dependability. *See Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955 (5th Cir.1993). Years of service cannot be equated with superior performance or qualifications. *See id.; see also Nichols,* 81 F.3d at 42. Accordingly, Martin has not established a *prima facie* case of discriminatory failure to promote under the TCHRA.

### c. *Discriminatory Discharge*

Martin further alleges that her placement on probation and ultimate discharge were racially and sexually discriminatory. To establish a *prima facie* case of discriminatory discharge, a plaintiff must show that:

(1) she is a member of a protected class;

(2) she was qualified for the position;

(3) she was discharged; and

(4) she was replaced by someone outside the protected class.

*See Faruki v. Parsons S.I.P., Inc.,* 123 F.3d 315, 318 (5th Cir.1997); *Meinecke,* 66 F.3d at 83; *Portis v. First Nat'l Bank of New Albany,* 34 F.3d 325, 328 n. 6 (5th Cir.1994); *Vaughn v. Edel,* 918 F.2d 517, 521 (5th Cir.1990). Alternatively, a plaintiff may establish a *prima facie* case by showing that she is a member of a protected class, she was qualified for the position, and persons outside the class were treated more favorably than she. *See Nieto,* 108 F.3d at 623 n. 5; *Waggoner,* 987 F.2d at 1163–64; *Johnson,* 853 F.2d at 381; *Thornbrough,* 760 F.2d at 639. To establish a *prima facie* case in this manner, the plaintiff must show that employees outside her protected class were retained or were treated differently under circumstances nearly identical to hers. *See Mayberry,* 55 F.3d at 1089; *Little,* 924 F.2d at 97.

Martin's ability to establish the first, second, and third elements of a *prima facie* case of discriminatory discharge under the TCHRA is undisputed. Martin is an African–American female who was qualified for the position of facility engineer. In addition, it is uncontested that Martin was discharged from her employment with Kroger on April 28, 1998. Kroger, however, maintains that Martin is unable to establish the fourth element of a *prima facie* case. Kroger points out that Martin was not replaced by someone outside the protected class. Indeed, she was not replaced at all. When asked at deposition, "Who was hired to take the place of Elaine Martin after you terminated her?", Hembree replied, "I did not replace her." Therefore, to proceed, Martin must show that non-black or male employees under similar circumstances were treated more favorably with regard to termination decisions. *See Nieto,* 108 F.3d at 623 n. 5; *Waggoner,* 987 F.2d at 1163–64; *Johnson,* 853 F.2d at 381; *Thornbrough,* 760 F.2d at 639.

In her response to the summary judgment motion, Martin complains that "Kro-

ger's assessment of disciplinary procedures against Martin is markedly different and less favorable as compared to similarly situated co-workers." To support this position, Martin relies on Hembree's deposition testimony:

Q: Now, out of the dozen or so times that you've given probation letters, can you remember the names of any of the people that you've given these probation letters to?

A: Yes.

Q: Tell me who they are.

A: Bob Marquardt.

\* \* \* \* \* \*

Q: What position did he hold?

A: Senior facility engineer.

Q: Is he still with The Kroger Company?

A: Yes.

\* \* \* \* \* \*

Q: When did you give him this probation letter?

A: I believe it was in December of [1998].

\* \* \* \* \* \*

Q: Any others?

A: Randy Cutlousky [sic].

Q: When did you give Mr. Cutlousky [sic] this probationary letter?

A: In early 1997.

Q: What was the reason for why, generally speaking, you believe Mr. Cutlousky [sic] warranted receiving this probation letter?

A: It was his [lack of] ability to work with other members of the organization.

\* \* \* \* \* \*

Q: For how long a period of time did he exhibit this lack of ability to work with other people?

A: For approximately four or five years.

Q: Was Mr. Cutlousky [sic] demoted—

A: Yes.

Q:—as a result of this action that you took?

A: Yes.

Q: What was the position he held before he was demoted?

A: He was assistant manager of engineering.

Q: Does that mean he was one step below you?

A: Yes.

Q: What was he demoted to?

A: Senior facility engineer.

\* \* \* \* \* \*

Q: Mr. Hembree, when was the Montrose construction project ongoing and completed?

A: 1997.

Q: Was this before or after you gave Mr. Cutlousky [sic] the probation letter?

A: After.

\* \* \* \* \* \*

Q: So on the heels of giving Mr. Cutlousky [sic] a probation letter, you gave him the opportunity to handle what you believed to be a significant construction project for Kroger?

A: Yes.

Q: What is Mr. Cutlousky's [sic] race?

A: He's white.

Q: Is he still working for Kroger?

A: Yes.

\* \* \* \* \* \*

Q: And you also gave a probation letter to Elaine Martin, correct?

A: Correct.

\* \* \* \* \* \*

Q: ... Bob Marquardt, Randy Cutlousky [sic] and Elaine Martin, are in positions of facility engineer or higher, correct?

A: Correct.

Q: And out of all those people, the only one that was terminated was Elaine Martin, correct?

A: That's correct.

Q: And Elaine Martin was the only female out of all those who got probation letters that was terminated, correct?

A: Correct.

Q: And she was the only black that was—that got probation letters and was terminated, correct?

A: Correct.

While Hembree's testimony demonstrates that Martin was the only black female, facility engineer to be placed on probation and subsequently terminated, it does not establish that Marquardt and Kottlowski were treated differently under nearly identical circumstances.

Martin offers no information about the situation leading up to, or the specific outcome of, Bob Marquardt's probation. As to Kottlowski, while both Martin and Kottlowski worked in the facility engineering department, received disciplinary probation, and were assigned in-house remodeling projects, Martin has not shown Kottlowski's performance problems mirrored hers or that he failed to improve his performance after being placed on probation. Specifically, there is no evidence that Kottlowski was placed on probation and subsequently demoted due to his lack of knowledge, persistent errors, failure to plan, organize, and oversee projects effectively, or that he was unwilling to improve his performance. In fact, the record reflects that, after his demotion, Kottlowski successfully managed the Montrose remodeling project, saving Kroger approximately $100,000. Martin even admits the project was successful. At deposition, when asked, "What do you know about success, from Kroger's perspective, of the Montrose store remodel?", Martin replied, "They said it went by with raving colors, was my understanding. They thought it went over well." In contrast, the evidence reflects that Martin's Seabrook project was poorly managed and plagued with difficulties.

Martin, therefore, has failed to provide sufficient evidence of a similarly situated, non-black or male employee who was treated more favorably than she with regard to her termination. Accordingly, Martin has not established a *prima facie* case of discriminatory discharge under the TCHRA.

### 3. *Legitimate, Nondiscriminatory Reasons*

Even if Martin had established a *prima facie* case of race or gender discrimination, Kroger has set forth adequate, nondiscriminatory reasons for its actions. Once a plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See Hicks*, 509 U.S. at 506–07, 113 S.Ct. 2742; *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir.1998); *Messer*, 130 F.3d at 137; *Faruki*, 123 F.3d at 320; *Walton*, 119 F.3d at 370. The purpose of this step is " 'to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent.' " *Stratton v. Department for the Aging*, 132 F.3d 869, 879 (2d Cir.1997) (quoting *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998)). "The employer need not persuade the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir.1998); *accord Williams*, 98 F.3d at 181, *Acevedo–Diaz v. Aponte*, 1 F.3d 62, 67 (1st Cir.1993); *Fields v. Clark Univ.*, 966 F.2d 49, 51 (1st Cir.1992), *cert. denied*, 506 U.S. 1052, 113 S.Ct. 976, 122 L.Ed.2d 130 (1993). Hence, the defendant's burden is relatively light. *See Greenway*, 143 F.3d at 52.

"If the employer produces any evidence 'which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action,' then the employer has satisfied its burden of

production." *Daigle v. Liberty Life Ins. Co.,* 70 F.3d 394, 396 (5th Cir.1995) (quoting *Hicks,* 509 U.S. at 507, 113 S.Ct. 2742); *EEOC v. Texas Bus Lines,* 923 F.Supp. 965, 970 (S.D.Tex.1996). "The employer's stated legitimate reason must be reasonably articulated and nondiscriminatory, but does not have to be a reason that the judge or jurors would act on or approve." *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1012 n. 6 (1st Cir.1979); *see Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir.1984). Indeed, even an employer's incorrect belief that "an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason." *Mayberry,* 55 F.3d at 1091 (citing *Little,* 924 F.2d at 97). The articulated reason, however, must be "clear and specific." *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1226 (2d Cir.1994). Furthermore, it "must be legally sufficient to justify a judgment for the [employer]." *Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 160 (1st Cir.1998) (quoting *Burdine,* 450 U.S. at 255, 101 S.Ct. 1089); *see Nichols,* 81 F.3d at 41; *Rhodes,* 75 F.3d at 992. If the defendant sustains its burden of production, "the presumption raised by the plaintiff's prima facie case essentially disappears, and the plaintiff is left with the ultimate burden which has never left him: that of proving that the defendant intentionally discriminated against him." *Tanik v. Southern Methodist Univ.,* 116 F.3d 775, 776 (5th Cir.), *cert. denied,* 522 U.S. 1015, 118 S.Ct. 600, 139 L.Ed.2d 488 (1997); *accord Bauer,* 169 F.3d at 966; *Messer,* 130 F.3d at 137; *Grimes,* 102 F.3d at 140.

■■■ In the present case, Kroger maintains that Martin's performance evaluations, lack of promotion, and eventual termination were not due to racial or sexual discrimination, but were the result of her lack of knowledge, poor performance, persistent errors, failure to plan, organize, and oversee construction projects effectively, inadequate communication skills, and unwillingness to improve her deficiencies, as well as her hostile and defensive approach to legitimate concerns expressed about her performance. Kroger points to Hembree's affidavit, which states, in part:

On November 25, 1997, I asked Ms. Martin to attend a meeting with me and George Anderson, the Manager of Human Resources. I presented Ms. Martin with a Supplemental Performance Evaluation outlining some of the problems associated with the Seabrook project. I explained that she was being placed on probation for a ninety (90) day period at the end of which her performance would be reviewed. I explained both orally and in the written evaluation that I prepared and gave to Ms. Martin that her failure to perform at a satisfactory level during that time would result in her termination.

Ms. Martin became extremely angry during the meeting and refused to sign the Supplemental Performance Evaluation. She indicated that she did not intend to change her performance and that Kroger would just have to fire her at the end of the probation period. She then made reference to having been called a racial epithet, and she angrily referred to "Terry and his racist ass." But when Anderson and I questioned her about who had allegedly made a racial slur, Ms. Martin refused to provide any more information. She made a statement to the effect that it would "all come out in court." Prior to that time, I had not been notified by Ms. Martin or anyone else that any Kroger employees or subcontractors had made racially derogatory comments. Finally, she never complained of gender discrimination at that or any other meeting.

After the November 25, 1997, meeting, Ms. Martin showed no indication of attempting to improve her performance. I received several additional complaints from the Seabrook store manager about the management of the project and Ms. Martin's lack of communication. In addition, I discovered additional mistakes Ms. Martin had made in the ordering of

equipment including an order for gas coils for the freezer and seafood coolers, when both operated with electric coils. Almost all equipment in the Houston area uses electric coils, and Elaine should have known this as a construction engineer. I also discovered that two quick chillers were ordered, when only one was needed and called for in the original specifications.

On or about January 26, 1998, I learned that Ms. Martin was involved in an automobile accident. To my knowledge, Ms. Martin did not return to work after the automobile accident until April 28, 1998. Because her performance after the November 25, 1997, meeting had not improved prior to the automobile accident, Ms. Martin was terminated upon returning to work on April 28, 1998. The decision to terminate Ms. Martin was made by myself and George Anderson, Manager of Human Resources.

Accordingly, Kroger has articulated specific reasons for its failure to promote and ultimate discharge of Martin, which permit the conclusion that its actions were not based on a discriminatory animus, thus satisfying its burden of production.

### 4. *Pretext for Discrimination*

█ Because Kroger has carried its burden of articulating legitimate, nondiscriminatory reasons for its actions, to prevail, Martin must prove by a preponderance of the evidence that Kroger's proffered reasons are a pretext for discrimination. *See Travis,* 122 F.3d at 263; *Price,* 119 F.3d at 337. To demonstrate a "pretext for discrimination," the plaintiff must show both that the employer's stated reasons for its actions are false and that prohibited discrimination was the real reason for the employer's decision. *See Hicks,* 509 U.S. at 515, 113 S.Ct. 2742; *Bauer,* 169 F.3d at 966; *Travis,* 122 F.3d at 263; *Swanson v. General Servs. Admin.,* 110 F.3d 1180, 1185 (5th Cir.), *cert. denied,* 522 U.S. 948, 118 S.Ct. 366, 139 L.Ed.2d 284 (1997); *EEOC v. Louisiana Office of Community Servs.,* 47 F.3d 1438, 1443 (5th Cir.1995). The

evidence of pretext must be more substantial than pure speculation; a plaintiff must provide sufficiently specific reasons for her allegations of pretext. *See Nichols,* 81 F.3d at 42. To avoid summary judgment, a "plaintiff must present evidence that both (1) rebuts the employer's non-discriminatory reason, and (2) creates an inference that [plaintiff's protected status] was a determinative factor in the challenged employment decision." *Ross v. University of Tex. at San Antonio,* 139 F.3d 521, 525 (5th Cir.1998) (citing *Rhodes,* 75 F.3d at 994). "The employer, of course, will be entitled to summary judgment if the evidence taken as a whole would not allow a jury to infer that the actual reason for the discharge was discriminatory." *Rhodes,* 75 F.3d at 994; *see Price,* 119 F.3d at 337; *Atkinson v. Denton Pub. Co.,* 84 F.3d 144, 148 (5th Cir.1996); *Hall v. Gillman Inc.,* 81 F.3d 35, 37 (5th Cir.1996).

█ Initially, Martin attempts to establish pretext by contending that she was better qualified than Smollen for the assistant manager position. For a factfinder to infer pretext, however, the plaintiff must show that she was "clearly better qualified," as opposed to merely better qualified or as qualified as the employee who was selected for the position. *See Nichols,* 81 F.3d at 42; *Louisiana Office of Community Servs.,* 47 F.3d at 1444; *Bodenheimer,* 5 F.3d at 959; *Odom,* 3 F.3d at 847; *Walther v. Lone Star Gas Co.,* 952 F.2d 119, 123 (5th Cir.1992). In order to defeat summary judgment, the difference in qualifications must be " 'so apparent as virtually to jump off the page and slap us in the face.' " *Louisiana Office of Community Servs.,* 47 F.3d at 1445 (quoting *Odom,* 3 F.3d at 847). Moreover, the evidence of superior qualifications must be more than merely subjective and speculative. *See Nichols,* 81 F.3d at 42; *Molnar v. Ebasco Constructors, Inc.,* 986 F.2d 115, 119 (5th Cir.1993); *Elliott v. Group Med. & Surgical Serv., Inc.,* 714 F.2d 556, 564 (5th Cir.1983), *cert. denied,* 467 U.S. 1215, 104

S.Ct. 2658, 81 L.Ed.2d 364 (1984). "To establish a fact question as to relative qualifications, a plaintiff must provide sufficiently specific reasons for his opinions, mere subjective speculation will not suffice." *Nichols,* 81 F.3d at 42.

As stated above, the Fifth Circuit has refused to "equate years served with superior qualifications." *Bodenheimer,* 5 F.3d at 959. "[G]reater experience alone will not suffice to raise a fact question as to whether one person is clearly more qualified than another." *Nichols,* 81 F.3d at 42. "More evidence, such as comparative work performance is needed." *Id.* Under these circumstances, it cannot be said that Martin was "clearly better qualified" than the individual who was selected for the position in question. As the court found in *Odom,* this court "find[s] that neither singly nor collectively do [Martin's] qualifications leap from the record and cry out to all who would listen that [she] was vastly— or even clearly—more qualified for the subject job than was [Smollen]." 3 F.3d at 847.

In another attempt to make some showing that Kroger's articulated reasons are pretextual, Martin asserts that she was subjected to offensive racist and sexist comments from Kroger employees, contractors, and subcontractors. Specifically, Martin alleges in her affidavit that she witnessed or was the subject of the following racial and sexual comments: a subcontractor's comment that he would not work for a "nigger;" a general contractor's August 19, 1997, comment that "a damn nigger woman don't [sic] know what the hell is going on in construction and should be home having babies;" a fixturing subcontractor's remark around January 14, 1997, that "[t]his is not work for stupid women;" a comment by Hildebrandt on February 9, 1998, that "this must have been somebody else you hired that can't speak no English," as well as a January 21, 1998, remark to other employees that they should not "worry about the niggers because they will be fired soon." With regard to her supervisor, Martin claims that on October 15, 1997, "Hembree pointed out to me that

I, like 'most blacks,' had a problem with pronouncing certain words 'properly' " and that on July 22, 1997, "Hembree told me that he grew up thinking that blacks expected to be called 'nigger' because that was common speech where he grew up." In addition, Martin points to the affidavit of Anthony Gaston ("Gaston"), an African-American tile and carpet subcontractor Martin hired to perform work on the Seabrook project. In his affidavit, Gaston states, "Hildebrandt treated me differently than other subcontractors because of my race (black). I heard Hildebrandt refer to me and Elaine Martin as 'niggers' on more than one occasion." In addition, Gaston claims that he overheard Hildebrandt tell some individuals that "Martin did not know what she was doing, that he was running this project, that they did not have to worry about the 'niggers' for much longer because they would be fired soon." Finally, Gaston maintains that "[i]t was Hildebrandt who started the rumor that Martin and I had a personal relationship, which was a false and baseless accusation against the both of us that reflected on our business reputations."

As discussed above, any discriminatory act that occurred more than 180 days before Martin filed her discrimination charge is not actionable. Thus, Martin's complaints regarding comments made before June 9, 1997, are untimely. With regard to any remarks made subsequent to June 9, 1997, to constitute evidence of discrimination, these remarks must be:

(1) related to the plaintiff's protected status;

(2) proximate in time to the employment decision at issue;

(3) made by an individual with authority over the employment decision at issue; and

(4) related to the specific employment decision challenged.

*See Krystek v. University of Southern Miss.,* 164 F.3d 251, 256 (5th Cir.1999); *Brown v. CSC Logic, Inc.,* 82 F.3d 651, 655

(5th Cir.1996). If the comments do not meet these criteria, they are merely "stray remarks" without probative value when offered either in connection with the plaintiff's *prima facie* case or to demonstrate pretext. *See Boyd v. State Farm Ins. Cos.,* 158 F.3d 326, 329–30 (5th Cir.1998) (supervisor's isolated references to an employee as a "Porch Monkey" and "Buckwheat" held to be stray remarks from which race discrimination could not be inferred); *Price,* 119 F.3d at 337 (supervisor's comment that he wanted to get rid of the older employees and hire "young blood" made two years prior to termination was a stray remark and not evidence of intentional age discrimination); *EEOC v. Texas Instruments, Inc.,* 100 F.3d 1173, 1181–82 (5th Cir.1996) (comments that company had to make room for younger supervisors and "it's just that you've reached that age and years of service that we can bridge you to retirement" found to be stray remarks); *Lo v. FDIC,* 846 F.Supp. 557, 564 (S.D.Tex.1994), *aff'd,* 52 F.3d 1066 (5th Cir.1995) (comment that "all Chinese guys like to trade" held to be stray remark because vague, remote in time, and not related to specific employment decision at issue). In short, "[t]he mere utterance of a racial epithet is not indicia of discrimination under Title VII." *Boyd,* 158 F.3d at 329 (citing *Anderson,* 26 F.3d at 1295); *see Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972) ("mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not fall within the proscription of Title VII). "Stray remarks with no connection to an employment decision cannot create a fact issue regarding discriminatory intent and are insufficient to defeat summary judgment." *Scales,* 181 F.3d at 712 (citing *Price,* 119 F.3d at 337; *Texas Instruments, Inc.,* 100 F.3d at 1181; *Ray v. Tandem Computers, Inc.,* 63 F.3d 429, 434 (5th Cir.1995)).

Direct evidence of discrimination consists of " 'conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflect-ing the alleged discriminatory attitude ... sufficient to permit the factfinder to find that attitude was more likely than not a motivating factor in the employer's decision.' " *Thomas v. First Nat'l Bank,* 111 F.3d 64, 66 (8th Cir.1997) (quoting *Kriss v. Sprint Communications Co.,* 58 F.3d 1276, 1282 (8th Cir.1995)). Evidence of discrimination, thus, does not include " 'stray remarks in the workplace,' 'statements by nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself.' " *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring); *Krystek,* 164 F.3d at 256. Furthermore, when pretext is at issue on summary judgment, "[a]bsent a causal link between the references and the conduct complained of, such epithets become stray remarks that cannot support a discrimination verdict." *Boyd,* 158 F.3d at 330 (citing *Ray,* 63 F.3d at 434); *see Scales,* 181 F.3d at 712. Hence, for Martin to prevail, she must " 'show[ ] a specific link between the [alleged] discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' " Kroger's decision to terminate her employment. *Thomas,* 111 F.3d at 66 (quoting *Philipp v. ANR Freight Sys., Inc.,* 61 F.3d 669, 673 (8th Cir.1995)). As Justice O'Connor has elaborated, "stray remarks in the workplace ... cannot justify requiring the employer to prove that its [employment] decisions were based on legitimate criteria." *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775 (citations omitted); *see Young,* 906 F.2d at 182 (finding that " 'white tokens' and 'white faggots' remarks would not be enough to shift the burden to the City").

"Evidence of a supervisor's occasional or sporadic use of a slur directed at an employee's race, ethnicity, or national origin is generally not enough to support a claim under Title VII." *Hong v. Children's Mem. Hosp.,* 993 F.2d 1257, 1260, 1265–66 (7th Cir.1993), *cert. denied,* 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994) (evidence

that division head made statements that plaintiff should "move back to Korea" and told her repeatedly to "learn to speak English" insufficient to support national origin discrimination claim); *see Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204 (10th Cir.1999) (supervisor's inquiry of African-American female about black men's sex organs, comment that employee "talked like people of her culture, race, or color," remark during confrontation about employee's job performance that "[y]ou are just on the defensive because you are black," and subsequent reference to employee after her termination as an "incompetent nigger" held not sufficient to establish pretext because the statements were of personal opinion and not directly related to employee's termination); *Nazaire v. Trans World Airlines, Inc.*, 807 F.2d 1372, 1380–81 (7th Cir.1986), *cert. denied*, 481 U.S. 1039, 107 S.Ct. 1979, 95 L.Ed.2d 819 (1987) (allegations that co-workers called plaintiff "black" and "monkey" found to be vague and inadequate to support racial discrimination claim); *see also Torres v. County of Oakland*, 758 F.2d 147, 152 (6th Cir.1985); *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir.1981); *Caridi v. Kansas City Chiefs Football Club*, 568 F.2d 87, 88 (8th Cir.1977). As the Supreme Court has noted, the " 'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not sufficiently alter terms and conditions of employment to violate Title VII." *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (quoting *Rogers*, 454 F.2d at 238); *see Barber v. International Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers*, 778 F.2d 750, 761 (11th Cir.1985); *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982).

"To be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process." *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir.1996); *see Rush v. McDonald's Corp.*, 966 F.2d 1104, 1116 (7th Cir.1992).

Such remarks, even when made by the supervisor who discharged the plaintiff cannot defeat summary judgment unless they are both proximate and related to the employment decision in question. *See Shorter*, 188 F.3d 1204; *Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1293 (7th Cir. 1997). Moreover, "[t]iming standing alone is not sufficient absent other evidence of pretext." *Boyd*, 158 F.3d at 330.

Racially based comments, even when made by the decisionmaker and highly offensive under contemporary standards, have been found insufficient to prove racial animus when the use of such slurs was infrequent and was not related to the challenged decision. *See Boyd*, 158 F.3d at 329–30; *Turner v. Local 1211, Int'l Union, Auto. Aerospace & Agricultural Implement Workers of Am., UAW*, 149 F.3d 1184, 1998 WL 385918, at *2 (6th Cir. July 2, 1998) (union president's use of term "fucking niggers" when referring to grievances filed by plaintiff found to be too isolated and not causally related to plaintiff's race discrimination claim); *Johnson*, 646 F.2d at 1257 (when there was "no steady barrage of opprobrious racial comment," occasional use by supervisors and fellow employees of the term "niggers" to refer to plaintiffs held not to violate Title VII); *Upshaw v. Dallas Heart Group*, 961 F.Supp. 997, 1000 (N.D.Tex.1997) (comment by physician involved in termination decision to "get that nigger rap music off of the telephone hold" found not sufficient to prove a racial animus when employee was not terminated for playing rap music); *see also Bahl*, 115 F.3d at 1293 (comments referring to "those people," criticism of Asian Indian plaintiff's English, and adverse reference to his "image" found to be stray remarks and insufficient to establish pretext). "[S]uch remarks, when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements were uttered by a decision maker." *Hong*, 993 F.2d at 1266; *see Boyd*, 158 F.3d at 330 (citing *Ray*, 63 F.3d at 434); *Figures v. Board of Pub. Utils. of*

*City of Kansas City,* 967 F.2d 357, 360–61 (10th Cir.1992); *McCarthy v. Kemper Life Ins. Cos.,* 924 F.2d 683, 686 (7th Cir.1991); *Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1438–39 (9th Cir.1990); *Smith v. Firestone Tire & Rubber Co.,* 875 F.2d 1325, 1330 (7th Cir.1989).

Here, the comments about which Martin complains either were not made by a decisionmaker or were unrelated and not proximate to her termination. Comments made by an employee who was neither a decisionmaker nor able to influence the termination decision are not actionable under Title VII or the TCHRA. *See Krystek,* 164 F.3d at 256; *Bahl,* 115 F.3d at 1293. Almost all of the comments to which Martin objects were allegedly voiced by non-decision makers, such as Martin's subordinate, Hildebrandt, the lead carpenter, or by non-employees, such as contractors and subcontractors. Martin has failed to adduce sufficient probative evidence showing a connection between any derogatory comments or discriminatory animus displayed by Hembree and her termination. *See Boyd,* 158 F.3d at 330; *Price,* 119 F.3d at 337. Instead, she relies on isolated, vague, innocuous, or remote stray remarks which are insufficient to sustain her burden on summary judgment. While, unquestionably, the use of the term "nigger" has no place in the employment setting, or in any other setting for that matter, there is no evidence in this case of sufficiently frequent or pervasive use of that word or other racially derogatory epithets to defeat summary judgment. *See Shorter,* 188 F.3d 1204; *Boyd,* 158 F.3d at 329–30; *Turner,* 1998 WL 385918, at *2; *Lenoir v. Roll Coater, Inc.,* 13 F.3d 1130, 1133 (7th Cir.1994); *Johnson,* 646 F.2d at 1252. Although the remarks attributed to Hembree may have been tactless and potentially derogatory, they are relatively mild compared to other comments the courts have found not to be actionable as a matter of law. *See, e.g., Shorter,* 188 F.3d 1204; *Boyd,* 158 F.3d at 329–30; *Waggoner,* 987 F.2d at 1166; *Young,* 906 F.2d at 182; *Johnson,* 646 F.2d at 1257; *Cariddi,* 568 F.2d at 88; *Upshaw,* 961 F.Supp. at 1000.

■ Kroger further points out that it is illogical that the same employee, Hembree, who hired Martin would only a few years later discriminate against her based on her race or gender. If Hembree had disliked Martin because she is an African–American female, or for any other reason, he would not have sought her out for the position of facility engineer. The Fifth Circuit has held that this situation "gives rise to an inference of non-discrimination" because it is illogical to assume that a decision-maker would recommend that an employee from a protected group be selected for a position merely to terminate her once she is on the job. *See Nieto,* 108 F.3d at 624. In *Brown,* the Fifth Circuit specifically approved the "same actor" inference:

> "[C]laims that employer animus exists in termination but not in hiring seem irrational." From the standpoint of the putative discriminator, "[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job."

82 F.3d at 658 (quoting *Proud v. Stone,* 945 F.2d 796, 797 (4th Cir.1991)); *accord Nieto,* 108 F.3d at 624. As in *Brown,* the facts in this case are not "sufficiently egregious to overcome the inference" that Kroger's stated reason for its actions is not a pretext for racial or sexual discrimination. *See* 82 F.3d at 658.

■ Next, Martin argues that her alleged performance problems constitute a pretext for discrimination because her prior employment history shows her to be a diligent and capable employee. In her affidavit, Martin claims that "Hembree had acknowledged several times in the past that I brought in my projects on time and on budget." In addition, Martin points to the following testimony of Hembree at deposition:

Q: The Seabrook project came within budget, didn't it?

A: I'm not aware of it going over budget.

Q: Okay. So it cam [sic] within budget. That's a credit to Ms. Elaine Martin in her—performing her job as a facility engineer, right?

\* \* \* \* \* \*

A: Most of Elaine's jobs were within budget.

Q: And that's a good thing; isn't it?

A: It certainly is.

Q: That's one of things [sic] you measure the performance of a facility engineer by?

A: That's correct.

\* \* \* \* \* \*

Q: And she was doing her job well on that aspect of measuring her job performance?

A: The measurement of whether a job is done well or not is more than whether or not it's delivered on budget and on time.

Evidence of her past acceptable performance, however, is tainted by Martin's subsequent poor performance and negative attitude, which in turn led to her termination. Any evidence of Martin's prior good performance is insufficient to show pretext in light of her more recent performance problems. *See Clay v. City of Chicago Dep't of Health*, 143 F.3d 1092, 1094 (7th Cir.1998) (proof that plaintiff was once considered an adequate employee does not suggest that employer's explanation for her discharge was pretextual); *Byrd v. Ronayne*, 61 F.3d 1026, 1032 (1st Cir.1995) (holding a prior favorable evaluation and the receipt of two bonuses to be insufficient evidence of pretext); *Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir.1992) (proof that plaintiffs were adequate employees before budget cut does not suggest that employer's explanation for their layoff masks age discrimination); *see also Aungst v. Westinghouse Elec. Corp.*, 937 F.2d 1216, 1223 (7th Cir.1991). Furthermore, "[a]n employee's self-serving statements about his ability ... are insufficient to contradict an employer's negative assessment of that ability." *Gustovich*, 972 F.2d at 848 (citing *Williams v. Williams Electronics, Inc.*, 856 F.2d 920, 924 (7th Cir.1988); *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464–65 (7th Cir.1986)). In addition, Martin's seniority has little bearing on the quality of her performance or dependability. *See Bodenheimer*, 5 F.3d at 959; *see also Nichols*, 81 F.3d at 42.

Martin further attempts to establish pretext by contending that she was treated differently than other employees. Specifically, Martin alleges that she was written up and terminated for poor performance, while other employees, not in her protected class, were not. To survive summary judgment, Martin must show that the other employees who allegedly received more favorable treatment were similarly situated. Hence, she must demonstrate that the "white [or male] employees were treated differently under circumstances nearly identical to [hers]." *Mayberry*, 55 F.3d at 1090; *see Little*, 924 F.2d at 97; *Smith v. Wal–Mart Stores*, 891 F.2d 1177, 1180 (5th Cir.1990); *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570–71 (5th Cir.1982). Martin, however, has adduced insufficient evidence to support a finding that she was similarly situated to these other employees. Namely, she does not show that the other employees worked in similar positions or had a consistent record of performance problems. Hence, because Martin fails to proffer adequate evidence to show that the other employees with whom she compares herself were similarly situated, she has not raised a fact issue on the genuineness of Kroger's reasons or its alleged discriminatory intent.

While Martin may disagree with Kroger's assessment of her performance and its decisions to place her on probation and ultimately terminate her employment, those were business decisions, which, in the absence of a discriminatory motive, the court will not disturb. *See Walton*, 119 F.3d at 372; *Guthrie v. Tifco Indus.*, 941 F.2d 374, 378 (5th Cir.1991), *cert. denied,*

503 U.S. 908, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992). The employment discrimination laws are "not intended to be a vehicle for judicial second-guessing of employment decisions nor ... to transform the courts into personnel managers." *Louisiana Office of Community Servs.*, 47 F.3d at 1448 (citing *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1507–08 (5th Cir. 1988)); *see Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 578, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *Walton*, 119 F.3d at 372; *Bodenheimer*, 5 F.3d at 959; *Waggoner*, 987 F.2d at 1165. "Federal Courts 'do not sit as a super-personnel department that reexamines an entity's business decisions ...'" *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991) (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988)).

It has long been the law in the Fifth Circuit that Title VII does not protect against unfair or unwise business decisions, only against decisions motivated by unlawful animus. *See Nieto*, 108 F.3d at 624. "Nor does the statute require the employer to have good cause for its decisions. The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix*, 738 F.2d at 1187 (citing *Megill v. Board of Regents*, 541 F.2d 1073, 1077 (5th Cir.1976)). " 'While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination.' " *Id.* (quoting *Loeb*, 600 F.2d at 1012 n. 6). As the Fifth Circuit explained in *Mayberry:*

> "[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason. We do not try in court the validity of good faith beliefs as to an employee's competence. Motive is the issue.... [A] dispute in the evidence concerning job performance does not provide a sufficient basis for a reasonable factfinder to infer that [the] prof-

fered justification is unworthy of credence."

55 F.3d at 1091 (quoting *Little*, 924 F.2d at 97); *see Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir.1989); *Sherrod v. Sears, Roebuck & Co.*, 785 F.2d 1312, 1316 n. 11 (5th Cir.1986); *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1256 (5th Cir. 1977). A showing of pretext "must extend beyond casting doubt on the reasonableness of the employer's action; otherwise, the law would be converted to a 'just cause' provision for the protected class of employees, an effect that Congress clearly did not intend." *Hanchey v. Energas Co.*, 925 F.2d 96, 98 (5th Cir.1990) (citing *Bienkowski*, 851 F.2d at 1508 n. 6).

In the final analysis, Martin's subjective perception of discrimination is all that remains. It is well established, however, that an employee's own subjective belief of discrimination, no matter how genuine, cannot serve as the basis for judicial relief. *See, e.g., Price*, 119 F.3d at 337; *Nichols*, 81 F.3d at 42; *Douglass*, 79 F.3d at 1430; *Ray*, 63 F.3d at 434; *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 153 (5th Cir.1995), *cert. denied*, 516 U.S. 1047, 116 S.Ct. 709, 133 L.Ed.2d 664 (1996); *Louisiana Office of Community Servs.*, 47 F.3d at 1448; *Portis*, 34 F.3d at 329; *Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261, 268 (5th Cir.1994). An employee's "bald assertions of [race or gender] discrimination are inadequate to permit a finding that proscribed discrimination motivated" an employer's conduct. *Ray*, 63 F.3d at 435. Moreover, the subjective belief of a fellow employee, whether a supervisor, coworker, or in this instance, a subcontractor, suffers from the same defects as the plaintiff's subjective belief. *See Little*, 924 F.2d at 96; *McConnell v. Thomson Newspapers, Inc.*, 802 F.Supp. 1484, 1504 n. 26 (E.D.Tex.1992). It does not matter "that the belief belongs to a party other than the plaintiff," even if the belief is held by a supervisor. *See Little*, 924 F.2d at 96. When, as here, an employee does not adduce objective evidence re-

futing the rational reasons articulated by the employer, pretext cannot be established by subjective beliefs that discrimination motivated the employer's actions. *See Armendariz*, 58 F.3d at 153; *Elliott*, 714 F.2d at 567.

In this instance, Martin has made no showing that Kroger's articulated reasons for its actions are false or that racial or sexual discrimination was actually the motivating factor for its employment decisions. Martin has not produced adequate evidence, either direct or circumstantial, to support a finding of discriminatory animus. Therefore, she has not shown that Kroger's articulated reasons for its actions were a pretext for unlawful discrimination. Under these circumstances, Martin has failed to adduce sufficient evidence to create a reasonable inference that her race or gender were determinative factors in Kroger's decisions with respect to her employment. Therefore, Martin cannot prevail on her claims of discrimination under the TCHRA, mandating summary judgment in favor of Kroger.

### D. *Retaliation under the TCHRA*

■■■ Martin further asserts that her 1997 performance rating and subsequent termination were in retaliation for her opposition to racist practices at Kroger and her filing of a charge of discrimination. The TCHRA provides:

> An employer ... commits an unlawful employment practice if the employer ... retaliates or discriminates against a person who, under this chapter:
>
> (1) opposes a discriminatory practice;
> (2) makes or files a charge;
> (3) files a complaint; or
> (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing.

TEX.LAB.CODE ANN. § 21.055; *see Marsaglia v. University of Tex.*, —— S.W.2d ——, No. 08–98–00271–CV, 1999 WL 649241, at *3 (Tex.App.—El Paso Aug. 26, 1999, no pet. h.); *McMillon v. Texas Dep't. of Ins.*, 963 S.W.2d 935, 940 (Tex.App.—Austin 1998, no pet.). Retaliation claims under the TCHRA are guided by the same analysis that applies to claims of retaliation under Title VII. *See Matthews v. High Island Indep. Sch. Dist.*, 991 F.Supp. 840, 844 n. 2, 846 n. 6 (S.D.Tex.1998) (stating that "state law analysis [under the TCHRA] is subsumed in the Court's Title VII analysis"). Title VII similarly prohibits retaliation against an employee who has engaged in activity protected by the Act:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–(3).

■■■ The anti-retaliation provision of the TCHRA, like that of Title VII, has two components—an opposition clause and a participation clause. *See Cox & Smith Inc. v. Cook*, 974 S.W.2d 217, 223–24 (Tex. App.—San Antonio 1998, pet. denied); *see also Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1185 (11th Cir.1997); *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1135 (5th Cir.1981). "The TCHRA protects an employee from retaliation or discrimination by an employer because the employee 'opposed a discriminatory practice.'" *Cox & Smith Inc.*, 974 S.W.2d at 223–24 (quoting TEX.LAB.CODE ANN. § 21.055(1)). "Under the first prong, to establish that the employee opposed a discriminatory practice, the employee must demonstrate a good faith reasonable belief that the underlying discriminatory practice of the employer violated the law." *Id.* (citing *Payne*, 654 F.2d at 1140–41). "The employee is not required to show that there was actual existence of an unlawful practice, only that she held a good faith reasonable belief that the employer engaged in activity made unlawful by Title VII or the TCHRA." *Id.* (citing *Payne*, 654 F.2d at 1140–41). "The opposition

clause of § 2000e–3(a) requires the employee to demonstrate that she had at least a 'reasonable belief' that the practices she opposed were unlawful." *Long v. Eastfield College,* 88 F.3d 300, 304 (5th Cir.1996) (citing *Payne,* 654 F.2d at 1140); *see De Anda v. St. Joseph Hosp.,* 671 F.2d 850, 853 n. 2 (5th Cir.1982); *Cox & Smith Inc.,* 974 S.W.2d at 223–24. The participation clause, however, does not include the "reasonable belief" requirement and provides broad protection to an employee who has participated in a Title VII proceeding. *See Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1312 (6th Cir.1989); *see also Hashimoto v. Dalton,* 118 F.3d 671, 680 (9th Cir.1997). Under both clauses, the employee must demonstrate that her opposition to perceived unlawful activity was a motivating or determining factor in the adverse employment action taken by her employer, *i.e.,* there must be a causal connection. *See Jack v. Texaco Research Ctr.,* 743 F.2d 1129, 1131 (5th Cir.1984); *McMillan v. Rust College, Inc.,* 710 F.2d 1112, 1116 (5th Cir.1983).

 The Fifth Circuit has held that "the burden-shifting structure applicable to Title VII disparate treatment cases, as set forth in *McDonnell Douglas Corp. v. Green,* ... is also applicable to Title VII unlawful retaliation cases." *Long,* 88 F.3d at 304 (citing *McDonnell Douglas Corp.,* 411 U.S. at 802–04, 93 S.Ct. 1817; *McMillan,* 710 F.2d at 1116). Therefore, after the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to proffer a legitimate, non-retaliatory reason for its actions. *See id.* at 304–05; *Shirley v. Chrysler First, Inc.,* 970 F.2d 39, 42 (5th Cir.1992) (citing *EEOC v. J.M. Huber Corp.,* 927 F.2d 1322, 1326 (5th Cir.1991)). If the employer meets its burden, the employee then bears the ultimate burden of showing that the reasons given by the employer are a pretext for retaliation. *See Shirley,* 970 F.2d at 42. "If the defendant introduces evidence which, if true, would permit the conclusion that the adverse employment action was nondiscriminatory, the focus shifts to the ultimate question of whether the defendant unlawfully retaliated against the plaintiff." *Long,* 88 F.3d at 305. "To carry her ultimate burden, an employee must also show that her employer would not have taken the adverse employment action 'but for' the employee's participation in the protected activity." *Scrivner v. Socorro Indep. Sch. Dist.,* 169 F.3d 969, 972 (5th Cir.1999); *see Walton,* 119 F.3d at 370; *Long,* 88 F.3d at 305; *Ray,* 63 F.3d 429, 435–36 (5th Cir.1995).

 To establish a *prima facie* case of retaliation, a plaintiff must show:

(1) she participated in statutorily protected activity;

(2) an adverse employment action occurred; and

(3) a causal connection exists between the protected activity and the adverse action.

*See Marsaglia,* —— S.W.2d at ——, 1999 WL 649241, at *2; *Cox & Smith Inc.,* 974 S.W.2d at 223; *Azubuike v. Fiesta Mart, Inc.,* 970 S.W.2d 60, 65 (Tex.App.—Houston [14th Dist.] 1998, no pet.); *Mayberry v. Texas Dep't of Agric.,* 948 S.W.2d 312, 315 (Tex.App.—Austin 1997, writ denied); *see also Scrivner,* 169 F.3d at 972; *Webb,* 139 F.3d at 540; *Messer,* 130 F.3d at 140; *Mattern,* 104 F.3d at 707; *Grimes,* 102 F.3d at 140; *Long,* 88 F.3d at 304; *Dollis,* 77 F.3d at 781. "An employee has engaged in activity protected by Title VII if she has either (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Grimes,* 102 F.3d at 140 (citing 42 U.S.C. § 2000e–3(a); *Long,* 88 F.3d at 304).

In this case, Martin claims to have engaged in protected activities when she opposed alleged racist practices at Kroger and when she filed a charge of employment discrimination with the EEOC. While it is undisputed that Martin engaged in a protected activity by filing a charge of discrimination, Martin's claims regarding

**556**

opposition to alleged discriminatory practices require further analysis. In her affidavit, Martin maintains that she received a below-average performance rating in 1997 because she reported offensive comments to Hembree. Specifically, Martin states:

Several times, I reported to Hembree that contractors and subcontractors were making racially offensive comments. I reported to Hembree on or about January 14, 1997 that Jacobs said to me "This .is not work for a stupid women." [sic] Susan Cantrell (white), a painting subcontractor, told me on or about March 22, 1997 that Tom Jacobs, a fixturing contractor told [her] that the Huggie Land area (Kroger's in-store activity area for children) "looks like a nigger designed it." ... I told Hembree of Jacobs' offensive remarks on or about May 29, 1997 and subsequently, on or about May 30, 1997, I received a negative performance evaluation. I had not received negative performance ratings from Hembree before, and I told Hembree that I did not believe the statements contained in it were accurate or truthful....

Martin also claims that:

The last significant event involving Hembree and Hildebrandt was when I opposed Hildebrandt's decision to get rid of the tile subcontractor for Seabrook, Anthony Gaston (black) on about November 19, 1997. There was quite a history of conflict between Hildebrandt and Gaston's crew, and Hildebrandt demanded that I fire Gaston on several occasions, based solely on Hildebrandt's word.... When I met with Hembree and Hildebrandt about Gaston, I pointed out that Kroger had never fired a contractor under circumstances like this previously. When white subcontractors had performance problems, Kroger worked with them and let [sic] make the necessary improvements. Yet Hembree and Hildebrandt wanted to fire the black subcontractor without knowing the whole story.... Hildebrandt wanted to know whether I was standing up for Gaston because, Hildebrandt thought, I was f__king Gaston. Hembree told me that I should back Hildebrandt, a Kroger employee, over Gaston, an outsider. Rather than address the issues I brought to Kroger's attention, Hembree disciplined me when I complained. On or about November 25, 1997—less than a week after the November 19, 1997 meeting in which Hembree told me to back Hildebrandt over Gaston—Hembree and Anderson called me away from a job site into a meeting where I was given a written notice that I had been placed on probation for poor performance....

Initially, it is apparent that Martin's complaints about comments made and a performance evaluation given prior to June 9, 1997, are time-barred. Furthermore, Martin's contention that she "had not received negative performance ratings from Hembree before" is refuted by the record. The evaluations merely became increasingly critical as time passed without Martin showing marked improvement. While Martin's opposition to the use of racial slurs might otherwise qualify as a protected activity if those comments were directed against coworkers, her opposition to the treatment afforded Gaston does not. Martin has failed to proffer evidence of any discriminatory employment practice with regard to Gaston, as he was not an employee of Kroger. According to Martin, Hildebrandt wanted Gaston removed as a subcontractor on the project due to perceived performance problems, and Hembree was dismayed because she had sided with an outsider rather than a Kroger employee. Martin's opposition to nondiscriminatory or non-protected practices does not qualify as a protected activity under the opposition clause. *See Azubuike*, 970 S.W.2d at 65 (citing *Booker*, 879 F.2d at 1313). To be protected under the anti-retaliation provision of Title VII, an employee's opposition must be to an activity that is unlawful or that the employee reasonably believes to be an unlawful employment practice under Title VII. *See*

*Long,* 88 F.3d at 304; *De Anda,* 671 F.2d at 853 n. 2; *Cox & Smith Inc.,* 974 S.W.2d at 223–24.

Discriminatory comments or actions directed at persons who are not employees, such as independent contractors or subcontractors, do not fall within the scope of Title VII. *See Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 135–36 (2d Cir.1999), *petition for cert. filed,* 68 U.S.L.W. 3116 (U.S. Aug. 2, 1999) (No. 99–206); *Little v. United Tech.,* 103 F.3d 956, 959–60 (11th Cir.1997); *Crowley v. Prince George's County,* 890 F.2d 683, 687 (4th Cir.1989); *Silver v. KCA, Inc.,* 586 F.2d 138, 141–42 (9th Cir.1978). As the Ninth Circuit explained in *Silver:*

> By the terms of the statute, ... not every act by an employee in opposition to racial discrimination is protected. The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual.

*Id.* Similarly, the acts of discrimination opposed by the employee must be against a fellow employee or applicant for employment, not a private individual. *See Wimmer,* 176 F.3d at 135–36; *Crowley,* 890 F.2d at 687. As with a hostile work environment claim, the person against whom the discrimination or hostility is directed must be in an employment relationship with the employer. *See Wimmer,* 176 F.3d at 136. "The specific evil at which Title VII was directed was not the eradication of all discrimination by private individuals, undesirable though that is, but the eradication of discrimination by employers against employees." *Silver,* 586 F.2d at 141.

▮ With regard to the second element of a *prima facie* case of retaliation, it is undisputed that Martin's termination was an adverse employment action. In contrast, her negative performance evaluations and placement on probation, even if undeserved, are not adverse employment actions giving rise to an actionable retaliation claim. *See Speer,* 123 F.3d at 664; *Smart,* 89 F.3d at 442; *see also Rabino-*

*vitz,* 89 F.3d at 488; *Meredith,* 18 F.3d at 896. " 'Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions.' " *Messer,* 130 F.3d at 140 (quoting *Dollis,* 77 F.3d at 781); *accord Watts,* 170 F.3d at 511; *Webb,* 139 F.3d at 540; *Mattern,* 104 F.3d at 707–08; *Bomer v. Dallas County Historical Found.,* No. 05–96–01724–CV. 1999 WL 34820, at *5 (Tex.App.—Dallas Jan. 28, 1999, no pet.).

Ultimate employment decisions include hiring, discharging, promoting, compensating, or granting leave. *See Webb,* 139 F.3d at 539; *Messer,* 130 F.3d at 135; *Mattern,* 104 F.3d at 707. "[E]mployment actions are not adverse where pay, benefits, and level of responsibility remain the same." *Watts,* 170 F.3d at 511; *see Speer,* 123 F.3d at 664; *Smart,* 89 F.3d at 442. Interlocutory or mediate decisions, even those that can lead to an ultimate employment decision, such as placing an employee on probation, are not adverse employment actions for purposes of a retaliation claim. *See Mattern,* 104 F.3d at 708; *see also Creswell v. Deere & Co.,* No. Civ. A. 3:96–CV–1392–P, 1997 WL 667928, at *9 (N.D.Tex. Oct. 21, 1997) (finding that placing an employee on probation and carefully monitoring her performance do not constitute ultimate employment decisions); *Edmond v. Fujitsu–ICL Sys., Inc.,* No. CA 3:95–CV–2548–BC, 1997 WL 118406, at *6 (N.D.Tex. Mar. 5, 1997) (holding that an employer's placement of an employee on probation did not "constitute an adverse employment action"). Probation does not necessarily lead to an employee's discharge, as it affords the employee an opportunity to improve her performance. If the employee displays sufficient improvement, no ultimate employment decision will occur.

The Fifth Circuit has held a wide array of actions taken by employers not to constitute ultimate employment decisions actionable under the anti-retaliation clause

of Title VII. *See Messer,* 130 F.3d at 135 (employer's failure to resolve internal grievances, close monitoring of employee's conversations, frequent criticism of employee's work and conduct, failure to heed employee's input, failing to permit employee to represent employer at business functions, and downsizing of employee's department do not constitute ultimate employment decisions); *Mattern,* 104 F.3d at 707–08 (hostility from fellow employees, having tools stolen, visits to employee's home, verbal threats of being fired, reprimands, a missed pay increase, and being placed on "final warning" are not actionable); *Dollis,* 77 F.3d at 779, 780, 782 (denial of desk audit which restricted opportunities for promotion, denial of attendance at training conference, provision of false information to employee regarding aspects of assignment, requiring that supervisor approve every document written by employee, and criticism of employee's work to a vendor also do not constitute adverse employment actions); *DeAngelis v. El Paso Mun. Police Officers Ass'n,* 51 F.3d 591, 597 (5th Cir.), *cert. denied,* 516 U.S. 974, 116 S.Ct. 473, 133 L.Ed.2d 403 (1995) (publication of office newsletter routinely ridiculing plaintiff due to her gender and her filing of EEOC charge alleging sexual discrimination found not to be adverse employment action).

Under these circumstances, aside from her termination, the retaliatory acts alleged by Martin were not adverse employment actions within the scope of the anti-retaliation provisions of the TCHRA and Title VII, as they caused no tangible changes in her duties or working conditions and resulted in no materially significant disadvantages. *See Manning,* 127 F.3d at 692. " '[N]ot every insult, slight, or unpleasantness gives rise to a valid Title VII claim.' " *Webb,* 139 F.3d at 539 (quoting *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1297 (3d Cir.1997)). Indeed, "[e]very job has its frustrations, challenges and disappointments, these inhere in the nature of work. An employee ... is not ... guaranteed a working environment free of stress." *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir. 1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986); *see McCann v. Litton Sys., Inc.,* 986 F.2d 946, 952–53 (5th Cir.1993).

■■■ Although the third element of a *prima facie* case—causation—is similar to the ultimate issue in an unlawful retaliation claim, the standard for establishing a causal link at the *prima facie* case stage is much less stringent. *See Long,* 88 F.3d at 304 n. 4; *Ray,* 63 F.3d at 435; *McMillan,* 710 F.2d at 1116–17; *Payne,* 654 F.2d at 1141 n. 13. As the Fifth Circuit has commented:

> At first glance, the ultimate issue in an unlawful retaliation case—whether the defendant discriminated against the plaintiff *because* the plaintiff engaged in conduct protected by Title VII—seems identical to the third element of the plaintiff's prima facie case—whether a *causal* link exists between the adverse employment action and the protected activity. However, the standards of proof applicable to these questions differ significantly.

*Long,* 88 F.3d at 305 n. 4 (emphasis in original). A plaintiff need not prove that her protected activity was the sole factor in motivating the employer's challenged decision in order to establish the requisite causal link. *See Long,* 88 F.3d at 304 n. 5; *De Anda,* 671 F.2d at 857 n. 12.

The consideration of three factors may be helpful in determining whether a causal link has been demonstrated at the *prima facie* case stage: (1) the plaintiff's past disciplinary record, (2) whether the employer followed its typical policies and procedures in terminating the employee, and (3) the temporal relationship between the employee's conduct and discharge. *See Nowlin v. RTC,* 33 F.3d 498, 507–08 (5th Cir.1994) (citing *Jenkins v. Orkin Exterminating Co.,* 646 F.Supp. 1274, 1277 (E.D.Tex.1986)). "The timing of the adverse employment action can be a significant, although not necessarily determinative, factor." *Mayberry,* 55 F.3d at 1092.

The causal connection requirement of plaintiff's *prima facie* case "may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Chavez v. City of Arvada*, 88 F.3d 861, 866 (10th Cir. 1996), *cert. denied*, 519 U.S. 1056, 117 S.Ct. 684, 136 L.Ed.2d 608 (1997) (citing *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir.), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982)).

■ In this situation, Martin's five-year employment history with Kroger reflects a number of persistent deficiencies in her work, with an overall declining level of performance over the years. The record indicates that, despite Hembree's repeated counseling and attempts to assist Martin with supplemental training and guidance, she failed to remedy these shortcomings. Moreover, Kroger appears to have followed its progressive discipline policy by giving Martin increasingly negative performance evaluations, placing her on probation, and ultimately terminating her employment. Nonetheless, the timing of her termination in relation to her complaints about discrimination is sufficiently questionable to raise an arguable fact issue as to the third element of a *prima facie* case of retaliation. The evidence reflects that Kroger placed Martin on a ninety-day probationary period on November 25, 1997. After that date, she worked approximately forty-five days, called in sick on January 26, 1998, and then was involved in an automobile accident on January 27, 1998. Martin remained on a leave of absence following the accident until April 28, 1998, when she reported for work and was terminated. In the interim, she filed a discrimination charge with the EEOC on December 9, 1997, and amended her charge on February 5, 1998. Thus, Martin's employment with Kroger was terminated within three months of her engaging in protected activity.

While Martin may be able to establish a *prima facie* case of retaliation, Kroger has proffered ample evidence of non-retaliatory reasons for Martin's discharge, *i.e.*, her poor performance and negative attitude, as detailed above. *See Shirley*, 970 F.2d at 42. The final inquiry, therefore, is whether the proffered reasons for Kroger's actions are merely pretextual. To demonstrate a "pretext for retaliation," the plaintiff must show both that the employer's stated reasons for its actions are false and that prohibited retaliation was the real reason for the employer's decision. *See Hicks*, 509 U.S. at 515, 113 S.Ct. 2742. In order to avoid summary judgment following a showing of a legitimate, non-retaliatory reason for a challenged employment decision, a plaintiff must create a fact issue as to whether each of the employer's stated reasons actually motivated the employer and create a reasonable inference that a desire to retaliate was a determinative factor in the employment decision. *See Grimes*, 102 F.3d at 140–41 (citing *Rhodes*, 75 F.3d 989 at 993). Unlike a disparate treatment case, which requires only that the prohibited factor be a substantial motive for the defendant's adverse action, "[t]he ultimate determination in an unlawful retaliation case is whether the conduct protected by Title VII was a 'but for' cause of the adverse employment decision." *Long*, 88 F.3d at 305 n. 4 (citing *McDaniel v. Temple Indep. Sch. Dist.*, 770 F.2d 1340, 1346 (5th Cir.1985)); *see Ray*, 63 F.3d at 435; *Shirley*, 970 F.2d at 43; *Jack*, 743 F.2d at 1131.

Under these circumstances, Martin has failed to demonstrate that Kroger's proffered reasons for her discharge are pretextual. She has made no showing that the articulated reasons for her termination are false. Martin also has not rebutted the evidence proffered by Kroger indicating that her performance as a facility engineer was unsatisfactory and that she was unwilling or unable to take the necessary steps to improve her performance. In fact, long before Martin filed a charge of discrimination with the EEOC, she was on the road to termination, as evidenced by Hembree's comments in her evaluation of

May 30, 1997, noting that she needed to make immediate improvements to be assured a future with Kroger. Therefore, in light of her numerous documented deficiencies, it cannot be said that "but for" her complaints of employment discrimination, Martin would have remained employed by Kroger. Thus, summary judgment is warranted with respect to Martin's retaliation claim.

### E. *Tortious Interference with Business Relations*

Finally, Martin contends that Kroger and Hembree tortiously interfered with her existing and prospective business relations. Specifically, she claims that Hembree interfered with her employment relationship with Kroger and that Hembree or others at Kroger interfered with her prospective employment with H.E.B. At deposition, Martin testified as follows:

Q: All right. You also have a claim of tortious interference with existing and prospective business relationships. My question to you is, what facts do you have to support this claim?

A: Once I was fired, I began—not immediately; a few months—looking for work.... H.E.B. [was] looking for a facility engineer, and I applied for [that position]. I received a lengthy telephone call. I guess it was a pre-interview. She interviewed me about an hour, whoever the lady was on the other end. She was in human resources, I believe. And she said that—that it sounds pretty good. She said, "You're doing exactly what's—exactly what the papers are asking for, but I need to get it to engineering and let me check out the references."

Then a couple of weeks passed by, and I just called to check out the status of it, you know, where was it in process [sic]; and she said that it was still in engineering. They was [sic] still verifying—trying to verify my experiences. And she asked me some in-depth questions about Kroger—

why did you leave and how did you leave. And I told her at this particular point, it just didn't work out; and I'm applying for a job with H.E.B. And then a week later I received a letter saying that—I can't remember the exact verbiage. It said I didn't have—not enough experience—that they wasn't [sic] quite looking for what I had, for the skills I had. They wasn't [sic] quite looking for it. And I thought that was pretty strange that everything that was listed in the newspaper that I had experience with. I didn't call and question on that other than to thank her for her time that she spent questioning me.

Q: What does that have to do with Mr. Hembree?

A: Well, I have no factual evidence that he talked to H.E.B.; but someone with H.E.B. engineering talked to Kroger's engineering. The telephone interview lady said that her engineering department had to call and check out, because it was so closely matched to what they were looking for. They were looking for somebody to build stores. And I guess they wanted to check it out and see if I actually done [sic] the work. I don't know what. And then I receive a letter saying thank you but no thank you. So someone—they talked to someone in Kroger.

Q: How do you know that?

A: Because they—the telephone—the girl on the telephone said that she could not set me up with an interview until her engineering department talked to ours—to Kroger's.

Q: But you don't know for a fact whether she or anybody in her engineering department talked to Mr. Hembree or anybody else in Kroger's engineering department, do you? ...

A: Right. I have no evidence or facts.

Q: How did Mr. Hembree tortiously interfere with your employment relationship with Kroger? ...

A: About—he allowed Terry's demeaning behavior to continue, even when, you know, I would come—I felt so—so neglected, so out of place in the engineering department once I filed a charge, because no one had nothing to say to me. We didn't socialize. We didn't talk about—we didn't talk about anything. And so—and I feel that the engineers were—someone talked to the engineers. The engineers didn't want to socialize and talk to me about anything other than the dispatchers that—the girls asked me what was going on.

Q: You didn't have an employment contract with Kroger, did you?

\* \* \* \* \* \*

A: No.

Q: In other words, you understood that your employment with Kroger was at will; right?

A: Right.

■ Texas courts recognize actions for tortious interference with both existing and prospective contracts. *See Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 664 (Tex.1990); *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 689 (Tex.1989); *Hart v. Attorneys–At–Law,* No. 01–97–00890–CV, 1999 WL 2391, at \*5 (Tex.App.—Houston [1st Dist.] Dec. 30, 1998, no pet.); *Doe v. SmithKline Beecham Corp.,* 855 S.W.2d 248, 258 (Tex. App.—Austin 1993), *aff'd as modified,* 903 S.W.2d 347 (1995); *Exxon Corp. v. Allsup,* 808 S.W.2d 648, 659 (Tex.App.—Corpus Christi 1991, writ denied). "These two torts differ primarily in that interference with prospective relations requires the plaintiff[ ] to prove both that [she] had a reasonable probability of obtaining a contract and that the defendant acted with malice." *Thrift v. Estate of Hubbard,* 44 F.3d 348, 357 (5th Cir.1995).

**1. *Existing Business Relations***

■ To establish a claim for tortious interference with existing contractual relations, the plaintiff must prove:

(1) the existence of a contract subject to interference;

(2) willful and intentional interference;

(3) proximate cause; and

(4) actual damage or loss.

*Powell Indus., Inc. v. Allen,* 985 S.W.2d 455, 456 (Tex.1998) (citing *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997)); *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 939 (Tex.1991); *Massey v. Houston Baptist Univ.,* 902 S.W.2d 81, 85 (Tex.App.—Houston [1st Dist.] 1995, writ denied).

■ "Texas law recognizes that a party to a contract has a cause of action for tortuous [sic] interference against a third party, (meaning a stranger of the contract) who wrongfully interferes with the contract." *Probst v. Ryder Truck Rental, Inc.,* No. Civ.A. 3:97–CV–2521–P, 1999 WL 184127, at \*9 (N.D.Tex. Mar. 29, 1999) (citing *Holloway v. Skinner,* 898 S.W.2d 793, 796 (Tex.1995)). When, like Hembree, the defendant is both a corporate agent and the third party who allegedly induced the corporation's breach, the second element is of particular importance. *See Powell Indus., Inc.,* 985 S.W.2d at 456 (citing *Holloway,* 898 S.W.2d at 796). That is because, by definition, a party to a contract cannot tortiously interfere with his own contract. *See Probst,* 1999 WL 184127, at \*9; *Holloway,* 898 S.W.2d at 796; *Hussong v. Schwan's Sales Enters., Inc.,* 896 S.W.2d 320, 326 (Tex.App.— Houston [1st Dist.] 1995, no writ). When the act of interference is allegedly committed by an individual who is also the lawful representative of the contracting party, the plaintiff must establish that the alleged act of interference was performed in furtherance of the defendant's personal interest, so as to preserve the rule that a party cannot tortiously interfere with his own contract. *See Powell Indus., Inc.,* 985

S.W.2d at 456–57; *ACS Investors, Inc.,* 943 S.W.2d at 432; *Holloway,* 898 S.W.2d at 796. In other words, "[t]he plaintiff must prove that the agent acted willfully and intentionally to serve the agent's personal interests at the corporation's expense." *Powell Indus., Inc.,* 985 S.W.2d at 457 (citing *Holloway,* 898 S.W.2d at 798); *see Probst,* 1999 WL 184127, at *9. "A corporate officer's mixed motives—to benefit both himself and the corporation—are insufficient to establish liability." *Powell Indus., Inc.,* 985 S.W.2d at 457 (citing *ACS Investors, Inc.,* 943 S.W.2d at 432).

When determining whether an agent acted against the corporation's interests, the court considers the corporation's evaluation of the agent's actions. *See id.* (citing *Morgan Stanley & Co. v. Texas Oil Co.,* 958 S.W.2d 178, 181–82 (Tex.1997)). "A corporation is a better judge of its own best interests than a jury or court." *Id.* (citing *Morgan Stanley & Co.,* 958 S.W.2d at 181). While a principal's complaint about its agent's actions is not conclusive of whether the agent acted against the principal's best interests, "if a corporation does not complain about its agent's actions, then the agent cannot be held to have acted contrary to the corporation's interests." *Id.* (citing *Morgan Stanley & Co.,* 958 S.W.2d at 182).

Contrary to Kroger's contention, however, an at-will employment relationship is subject to tortious interference. "Texas law firmly supports the contractual nature of an at-will employment relationship...." *Fadeyi v. Planned Parenthood Assoc.,* 160 F.3d 1048, 1050 (5th Cir.1998). The Texas Supreme Court has recognized that an at-will employment relationship is a contract, notwithstanding that either party may terminate it at will. *See id.* Thus, until an employee is terminated, "third persons are not free to tortiously interfere with contracts which are terminable-at-will." *Knox v. Taylor,* 992 S.W.2d 40, 57 (Tex.App.—Houston [14th Dist.] 1999, no pet.) (citing *Sterner,* 767 S.W.2d at 689). Therefore, "it is no defense to an action for tortious interference that a con-

tract is terminable at will." *Knox,* 992 S.W.2d at 58 (citing *Juliette Fowler Homes, Inc.,* 793 S.W.2d at 666); *Sterner,* 767 S.W.2d at 689; *Massey,* 902 S.W.2d at 85.

Here, Martin has failed to present evidence that Hembree willfully or intentionally interfered with her relationship with Kroger. There is no indication that Hembree's actions or inaction were motivated by his personal interests or contrary to Kroger's interests. There is also no suggestion that Kroger ever complained about Hembree's actions with respect to Martin. Thus, Martin cannot establish a *prima facie* case of tortious interference with existing business relations based on Hembree's conduct.

Furthermore, to the extent Martin's claim of tortious interference with existing business relations is merely a restatement of her employment discrimination claim, it is foreclosed by the TCHRA. "The TCHRA provides the exclusive state-law means for redress of employment discrimination and preempts claims for discrimination brought under other state-law theories." *Cook v. Fidelity Invs.,* 908 F.Supp. 438, 442 (N.D.Tex.1995) (holding claim for negligent supervision brought by black employee complaining of company's failure to prevent racial discrimination to be preempted by TCHRA) (citing *Vincent,* 895 S.W.2d at 473–74 (finding TCHRA to preempt claim of retaliatory discharge brought under the Texas Tort Claims Act); *Stinnett v. Williamson County Sheriff's Dep't,* 858 S.W.2d 573, 576–77 (Tex.App.—Austin 1993, writ denied) (finding claim of retaliatory discharge under Whistle Blower Act to be preempted by more specific provisions of TCHRA); *Bates v. Humana, Inc.,* No. Civ.A. SA–92–CA–432, 1993 WL 556416, at *11 (W.D.Tex. Oct. 12, 1993) (holding common law claims arising from defendant's discriminatory behavior to be preempted by TCHRA)); *accord Lott v. Eastman Kodak Co.,* No. Civ.A. 3:97–CV–2560–P, 1999 WL 412824, at *9 (N.D.Tex. Jun. 15, 1999) (holding claims of negligent

retention and supervision preempted by TCHRA); *Cannizzaro v. Neiman Marcus, Inc.*, 979 F.Supp. 465, 478–79 (N.D.Tex. 1997) (finding claims of negligent retention and supervision of sales manager who allegedly engaged in age discrimination to be preempted by TCHRA); *see* Tex.Lab. Code Ann. § 21.211; *but see Gonzales v. Willis*, 995 S.W.2d 729, 738 (Tex.App.—San Antonio 1999, no pet.); *Perez v. Living Centers–Devcon, Inc.*, 963 S.W.2d 870, 875 (Tex.App.—San Antonio 1998, pet. denied). A plaintiff "may not seek relief under both the administrative scheme of the Labor Code and other civil remedies at law." *O'Bryant*, 949 S.W.2d at 417 (citing *Schroeder*, 813 S.W.2d at 487).

### 2. *Prospective Business Relations*

■ Martin's claim regarding interference with prospective contractual relations arises from H.E.B.'s failure to hire her as an engineer. To establish a claim for tortious interference with prospective business relations, the plaintiff must prove that:

(1) there was a reasonable probability that the plaintiff would have entered into a contractual relationship;

(2) the defendant committed a malicious and intentional act that prevented the relationship from occurring, with the purpose of harming the plaintiff; and

(3) actual harm or damage resulted from the defendant's interference.

*See Gaia Techs. Inc. v. Recycled Prods. Corp.*, 175 F.3d 365, 377 (5th Cir.1999); *Thrift*, 44 F.3d at 356–57; *Cockerham v. Kerr–McGee Chem. Corp.*, 23 F.3d 101, 105 (5th Cir.1994); *Winston v. American Med. Int'l, Inc.*, 930 S.W.2d 945, 953 (Tex.App.—Houston [1st Dist.] 1996, writ denied). As in any other tort action, "there must be a causal link between the conduct complained of and the resulting damages." *Texas Commercial Bus. Sys., Inc. v. FCC*, 898 F.2d 460, 462 (5th Cir.1990); *Diesel Injection Sales & Servs., Inc. v. Renfro*, 656 S.W.2d 568, 573 (Tex.App.—Corpus Christi 1983, writ refused n.r.e.).

In order to prove a cause of action for tortious interference with prospective contract, the plaintiff must first show that there existed a reasonable probability that, absent the interference, the plaintiff would have entered into a contractual relationship. *See Gaia Techs. Inc.*, 175 F.3d at 377. "It is not necessary to prove that the contract would have certainly been made but for the interference; it must be reasonably probable, considering all of the facts and circumstances attendant to the transaction." *Hill v. Heritage Resources, Inc.*, 964 S.W.2d 89, 109 (Tex.App.—El Paso 1997, no writ) (citing *Allsup*, 808 S.W.2d at 659). "More than mere negotiations must have taken place." *Id.* (citing *Caller–Times Publ'g Co. v. Triad Communications, Inc.*, 855 S.W.2d 18, 21 (Tex. App.—Corpus Christi 1993, no writ); *Grace v. Zimmerman*, 853 S.W.2d 92, 95 (Tex.App.—Houston [14th Dist.] 1993, no writ)).

■ Here, Martin has presented no evidence to demonstrate that there was a reasonable probability that Martin and H.E.B. would have entered into an employment contract in the absence of Kroger's actions. Indeed, she has presented to evidence that H.E.B., in fact, contacted Kroger's Engineering Department, much less that H.E.B. declined to hire her as a result of any information supplied by Kroger. Martin, therefore, cannot establish the first element of a *prima facie* case of tortious interference with prospective business relations.

Accordingly, summary judgment is proper as to Martin's claims against Kroger and Hembree for tortious interference with existing and prospective business relations.

### III. *Conclusion*

In this action, Martin has submitted no evidence to indicate that Hembree qualifies as an employer for the purposes of liability under the TCHRA. Therefore, Martin's TCHRA claims against Hembree in his individual capacity must be dis-

**564**

missed for failure to state a claim upon which relief can be granted. Summary judgment, therefore, is warranted as to Martin's employment discrimination and retaliation claims against Hembree in his individual capacity.

Martin has presented insufficient summary judgment evidence in support of her contentions that she suffered an adverse employment action with respect to her compensation, her authority as a supervisor, her workload, or the attribution of credit for her accomplishments. She also has not shown that similarly situated, non-black or male employees were treated more favorably with regard to these issues. Furthermore, Martin has provided inadequate evidence that she was qualified for a promotion to the Facility Engineering Department's assistant manager position. Moreover, Martin has failed to proffer sufficient evidence that she was replaced by a non-black or a male employee or that non-black or male employees under similar circumstances were treated more favorably than she with regard to her termination. Martin, therefore, cannot establish *prima facie* cases of disparate treatment in terms and conditions of employment, failure to promote, or discriminatory discharge under the TCHRA. Even if Martin had established a *prima facie* case of race or gender discrimination, Kroger has set forth adequate, nondiscriminatory reasons for its actions, which Martin has failed to demonstrate were merely a pretext for discrimination. Consequently, summary judgment is proper as to Martin's claims of race and gender discrimination under the TCHRA.

Although Martin may be able to establish a *prima facie* case of retaliatory discharge under the TCHRA, Kroger has adduced ample evidence of non-retaliatory reasons for her termination, which Martin has failed to rebut. Thus, summary judgment is also appropriate as to Martin's retaliation claims.

Finally, because Martin has failed to establish that a genuine issue of material fact exists with regard to her claims against Kroger and Hembree for tortious interference with existing and prospective contracts, summary judgment in favor of the defendants is mandated. Moreover, to the extent Martin's claim of tortious interference with existing business relations restates her employment discrimination claim, it is preempted by the TCHRA.

Accordingly, Kroger and Hembree's Motion for Summary Judgment is GRANTED. Martin has failed to present a claim that would entitle her to relief. There remain no material facts in dispute, and Kroger and Hembree are entitled to judgment as a matter of law.

IT IS SO ORDERED.